UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| (9)    ELIZABETH HENRIQUEZ, | ) | |
| (10)   MANUEL HENRIQUEZ, | ) | |
| (11)   DOUGLAS HODGE, and | ) | |
| (12)   MICHELLE JANAVS, | ) | |
| | ) | |
| Defendants | ) | |

## GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM

The four defendants who stand before this Court for sentencing – Douglas Hodge, Michelle Janavs, Elizabeth Henriquez, and Manuel Henriquez (together, the "defendants") – are far and away the most culpable parents in the college admissions cases to have admitted their guilt to date. They also rank among the most culpable parents charged. They are repeat players, who engaged in the conspiracy again and again, over years. They allowed their children to become complicit in their crimes. Several of them sought to maximize their illicit gains by deducting their bribe payments from their income taxes as fake charitable contributions. And they did so from perches at the apex of money and power in the United States – including, in two cases, positions of trust as leaders of multi-billion dollar companies – that offered them extreme, almost unfathomable privilege.

Defendant Douglas Hodge was the chief executive officer of Pacific Investment Management Company ("PIMCO"), one of the world's largest asset management companies. Over nearly 11 years, he engaged co-conspirator William "Rick" Singer five separate times, successfully employing bribery and fraud to secure the admission of two of his children to

Georgetown University, and two to the University of Southern California ("USC").[1]  Defendant

Manuel Henriquez was the chief executive officer of Hercules Capital, a publicly traded company.

Together with his wife, Elizabeth Henriquez, he likewise engaged Singer five times to cheat on

his two children's college entrance exams, and an additional time to secure his child's admission

to Georgetown.  And defendant Michelle Janavs was an heir to a massive fortune who served,

along with Hodge, as a trustee of an elite private secondary school whose honor code commands

students to "live honorably."[2]  She, too, engaged Singer twice to cheat on college entrance exams

for her two children and an additional time to secure her child's admission to USC.

Unlike the defendants who have been sentenced to date, these defendants waited to accept

responsibility for their crimes until months after they were indicted, and after they had a chance to

review the overwhelming evidence of their guilt.  Unlike prior defendants, they stand convicted of

two crimes: conspiracy to commit money laundering, as well as conspiracy to commit the

underlying fraud.  Collectively, they engaged in Singer's scheme 14 times, for nine children, over

more than 11 years, spending a total of more than $1.6 million in bribes and other payments to

facilitate the fraud.  They corrupted the educational system and undermined public trust.  And they

stopped only because they either ran out of children, or ran out of time, before they got caught.

For these reasons, and the reasons set forth below, the government respectfully

recommends that the Court impose terms of imprisonment of 24 months for Hodge, 21 months for

Janavs, 26 months for Elizabeth Henriquez, and 18 months for Manuel Henriquez.

---

[1] Appendix A, which contains victim impact statements, is filed under seal pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8) (mandating that victims have the "right to be treated with fairness and with respect for the victim's dignity and privacy.") and FED. R. CRIM. P. 32(i)(4)(C).  *See, e.g.*, *United States v. Korbe*, No. 09-cr-0056, 2010 WL 11527423, at *4 (W.D. Pa. Nov. 8, 2010) (denying motion to unseal victim impact statement because "on balance, the privacy interest of [the victim] far outweighs the public right to access this information.").

[2] *See* https://www.sagehillschool.org/about/honor-code.

## I.     THE OFFENSE CONDUCT

The defendants each paid bribes, and engaged in other forms of fraud, to facilitate their children's admission to elite colleges and universities, and thereby to deprive more qualified applicants of those opportunities.  In so doing, they also committed money laundering, using the cover of a sham charity to conceal their actions.  And three of the defendants also deducted their bribe payments from their taxes, falsely describing them as charitable contributions.

### A.     <u>Douglas Hodge</u>

Hodge engaged in the scheme more often, and over a longer period of time, than any of the defendants charged to date, paying bribes totaling $850,000, over more than a decade, to secure the admission of two children to USC and two children to Georgetown.  He also sought unsuccessfully to use bribes to secure the admission of a fifth child to Loyola Marymount University ("LMU").

### 1.  Hodge's Two Georgetown "Side Doors"

Hodge's involvement began in the fall of 2008, when he agreed to pay Georgetown tennis coach Gordon Ernst to purport to recruit his oldest daughter as a tennis player, thereby facilitating her admission to the university through what Singer euphemistically called the "side door." Ultimately, Hodge paid Ernst $150,000 for that admission, mailing him two checks, for $75,000 each, that he made out to Ernst personally, and sent to Ernst's home address.

As part of the scheme, Hodge knowingly allowed Singer to fabricate his daughter's tennis credentials.  Her application to Georgetown even mentioned a tennis court that she had purportedly

built in the Cambodian jungle. As his daughter's Georgetown interview approached, Hodge confided in Singer that "it would NOT be good at all if tennis in Cambodia came up."

And Hodge allowed his daughter to become complicit in the fraud. In February 2009 – after she had received a "likely letter" from Georgetown – Singer, with Hodge's knowledge, counseled her to "stay under the radar" and not "say anything" during the interview about having already been admitted.

In 2010 and 2011, Hodge repeated the fraud for his oldest son. In December 2010, Singer e-mailed Hodge and his son a draft application essay for Georgetown that falsely described Hodge's son as "one of Japan's top youth tennis players" and indicated that he "look[ed] forward to playing tennis at Georgetown." In fact, like his sister, Hodge's son did not play competitive tennis. After his son was admitted to Georgetown, Hodge sent Ernst another $175,000 bribe.

### 2. Hodge's Two USC "Side Doors"

For his next two children, Hodge set his sights on USC. In 2013, Hodge's daughter was admitted to the university as a fake soccer recruit. Her application included the false representation that she was the co-captain of a Japanese national soccer team. After she was accepted, Singer registered her as a student-athlete with the National Collegiate Athletic Association ("NCAA") Eligibility Center. Singer e-mailed Hodge and his daughter to request that they mail an official high school transcript either to him or to the NCAA. Hodge, replying to Singer alone, expressed concern that requesting a transcript for NCAA registration would "raise . . . suspicion" at his daughter's high school, where Hodge served as a member of the board of trustees (a position he held for some eight years, until his 2019 arrest).

For this admission, Hodge paid Singer a total of $200,000: $50,000 to Singer's for-profit company, The Key, and $150,000 to his purported charity, The Key Worldwide Foundation

("KWF").  Singer, in turn, used the money to pass bribes to Laura Janke and Ali Khosroshahin, the USC soccer coaches who facilitated the fraudulent admission.[3]

In 2014, Hodge agreed to pay $325,000 to bribe Donna Heinel, a senior administrator of women's athletics at USC, in exchange for admitting his second son as a purported football recruit. In early 2015, Singer e-mailed Hodge two falsified athletic profiles, one for football and one for tennis. Both had been created by Janke to make Hodge's son appear to be a legitimate athletic recruit. Thereafter, Heinel instructed Janke to "let the father know to send the check directly to me at USC, make out to what we had discussed before." Janke forwarded Heinel's message to Singer, who forwarded it to Hodge, writing: "Doug one of the folks helping us at USC sent the message below . . . I will need to take care of the different parties separately, which I will accomplish to finalize all the dealings. Once you receive the Acceptance please let me know so we can move forward financially." Hodge replied: "Fantastic!! Will do."

Shortly thereafter, Hodge sent a $75,000 check to the "Women's Athletic Board," the account at USC Heinel had designated. Hodge also wired $125,000 to The Key and $125,000 to KWF. Hodge later wrote off the $75,000 payment to USC and the $125,000 payment to KWF as purported charitable donations on his 2015 tax return.[4]

### 3.  The Attempted LMU "Side Door"

In 2018, Hodge returned to Singer for more of what Hodge termed the "Rick magic," asking Singer to facilitate his third son's admission to LMU. This time around, Hodge told Singer, "I know how this works . . . we don't have to talk in code." By September 2018, after Singer told him that gaining admission to LMU would cost between $200,000 and $250,000, Hodge replied:

---

[3] Janke and Khosroshahin have pled guilty to racketeering conspiracy and are cooperating with the government's investigation.

[4] Following his arrest, Hodge amended the return to remove these deductions.

"That's pretty significant, but okay, I can-- we'll swing that."  Thereafter, Singer sent an LMU basketball coach Hodge's son's high school transcripts and SAT score.  In December 2018, however, the LMU coach told Singer that Hodge's son would be denied admission to the university due to poor grades.

### 4.   Hodge Agreed to Cover-Up His Crimes

In a November 30, 2018 call between Singer and Hodge, made at the direction of law enforcement agents, Hodge agreed to lie to the Internal Revenue Service ("IRS") to cover-up his crimes:

| | |
|---|---|
| Singer: | We had the discussion about us being audited. |
| Hodge: | Yes. |
| Singer: | Now they've decided that they are going to make phone calls to all the USC kids' donations. |
| Hodge: | Okay. |
| Singer: | So there's-- there's 25, 30, 35 kids total.  I don't know who they're going to call and who they're not but I-- you know, what I've told them is, you know, there was $200,000 for [your second daughter], 250[,000] for [your second son], that they both got in, and that we both know they both got in through athletics. [Your second daughter] got in even though she wasn't a-- a legit soccer player and [your second son] not a legit-- I think we did football for [him]. |
| Hodge: | Right. |
| Singer: | But we didn't go in there. We didn't even discuss that. What I said to them is that your monies essentially went to our foundation to help fund underserved kids and that's how we left it. But I think that they're going to call some of the USC families that we've gone [inaudible] the years. So I just wanted you to have a heads-up. |
| Hodge: | So with [my second daughter]—[my second son] I'm fine. I'm complete-- and I'm first of all, I will-- I-- what you just described is exactly-- would be my words, okay.  **So you** |

**don't have to worry.  I'm not going to-- I'm not-- I'm not going off script here.**  One thing to remember is, I had a conversation. You set me up with this woman, who I think was like the-- not-- she wasn't the soccer coach but she was in the athletics department.

Singer:     So it might have been with Donna Heinel that you guys--

Hodge:     Yeah.

Singer:     Okay.

Hodge:     But we talked on the phone and she said, you know, "Thank you very much," and I said, "Well, we want to support USC athletics and looking forward to [my daughter]," and, you know, all this-- all that stuff. So that conversation sort of pierces that story of, I made a donation into the foundation, because she was like basically, "Well, thank you, Mr. Hodge, for your-- I'll call it support." We didn't talk about money. There was no conversation about-- there was not dollars discussed on that phone call. **But, you know, we're kind of talking in code here.**

Singer:     Right.

Hodge:     So that's out there.

Singer:     Yeah.

Hodge:     I don't know if they talked to her, what she might say, but I-- I know what I did, which is I donated to your foundation. That foundation has-- its stated mission is to help underserved kids basically get into-- you know, through-- get through college. And that's all I'm going to say.

### B.   Michelle Janavs

Janavs paid Singer $100,000 to cheat on two ACT exams by having a third co-conspirator, Mark Riddell, ensure that her two daughters received high scores.[5]  She also agreed to pay $200,000 to have one of her daughters admitted to USC as a purported beach volleyball recruit.

#### 1.   The ACT Cheating

In the summer of 2017, Janavs agreed to pay Singer $50,000 to cheat on her older daughter's ACT exam. After obtaining "extra time" for her daughter to take the exam based on a purported disability, Janavs arranged to move the test to a high school in West Hollywood, California (the "West Hollywood Test Center") that Singer controlled through another co-conspirator, Igor Dvorskiy.[6]

In October 2017, Riddell flew from Tampa to Los Angeles and purported to proctor the exam for Janavs's daughter.  In fact, Riddell corrected her answers after she had completed the test, securing a score in the 97th percentile.  Janavs paid $50,000 to KWF and Singer, in turn, paid a portion of that money to Riddell and Dvorskiy.

Thereafter, Janavs made plans to cheat on her younger daughter's ACT.  This time, Janavs expressed a desire to keep the scheme from her younger daughter.  In a call with Singer, she explained: "[T]he only thing is h-- [my younger daughter] is not like [my older daughter]. I'm not [inaudible] works. She's not stupid. So if I said to her, 'Oh, well, we're going to take it up at Rick's,' she's going to wonder why. How do you do this without telling the kids what you're

---

[5] Riddell pled guilty to conspiracy to commit mail fraud and honest services mail fraud, and conspiracy to commit money laundering, and is cooperating with the government's investigation.

[6] Dvorskiy pled guilty to racketeering conspiracy and is cooperating with the government's investigation.

doing?"  During the same conversation, however, Janavs was less concerned about questions her daughter's high school might ask – implicitly referencing the fact that Janavs served on the school's board of trustees.  She noted:  "[T]hey're not stupid either, but whatever, I don't care. They can't say anything to me."

On February 5, 2019, Singer sent Janavs a text message asking her to "send half the money now so I can pay Igor and Mark now."  The same day, Janavs mailed a check in the amount of $25,000 to KWF.  The following day, Janavs sent Singer a text confirming that she wanted Riddell to secure a score of 33 or 34 on the exam.  On February 12, 2019 – three days after Riddell corrected her daughter's exam answers, and secured the promised score of 34 – Janavs wired an additional $25,000 to KWF.

### 2.  Janavs's Bribery of Donna Heinel

At around the same time, Janavs agreed to pay $200,000 to facilitate her daughter's admission to USC as a purported beach volleyball recruit.  In an October 1, 2018 call, Singer explained the fraud to Janavs, noting that after her daughter received a "likely letter,"  "at that point you guys would send a $50,000 check to USC Athletics, in care of Women's Athletics," and that once she was formally admitted, "then you would send the rest of the money."  He cautioned: "[i]f you want to share it with [your daughter] that's fine, but it's gotta stay really quiet, because everybody's gonna be like, 'How did you get this prior to even applying?'"  Janavs responded: "Right."

In October 2018, Janavs's daughter was granted conditional admission to USC as a purported beach volleyball recruit, and Janavs sent $50,000 to USC Women's Athletics, the account designated by Heinel.[7]  Later that month, Janavs told Singer that a USC development

---

[7] Janavs was arrested before she could send the remaining $150,000 to KWF.

9

officer had tried to contact her.  Janavs said she was "afraid if she gets my phone number and I answer it, like, I don't want to open up a can of worms or say anything I'm not supposed to say," adding that she "didn't want to get anybody in trouble."

C.    **Manuel and Elizabeth Henriquez**

Manuel and Elizabeth Henriquez cheated on more standardized tests than any other co-conspirator: twice for their oldest daughter and three times for their youngest daughter.  In addition to paying Singer nearly $50,000 to facilitate the standardized test cheating, Manuel Henriquez also agreed to pay for the cheating in kind, by using his position as a prominent alumnus and former member of the corporation at Northeastern University, in Boston, to advocate for the admission of one of Singer's other students.[8]  The Henriquezes also paid Singer $400,000 to have Ernst purport to recruit their oldest daughter to the Georgetown tennis team, thereby facilitating her admission to the university.[9]

### 1.   The Henriquezes Cheated Five Times on College Entrance Exams

Beginning in the summer of 2015, the Henriquezes arranged with Singer to have a proctor provide their daughter with answers to some of the questions on her SAT II subject tests.  Singer billed the Henriquezes $2,500 for the cheating, most of which he passed on to the proctor.

Four months later, the Henriquezes, arranged to pay Singer $25,000 to have Riddell purport to proctor their daughter's SAT exam.  Riddell flew to San Francisco from Tampa for the test, and once again provided her with answers.  During the car ride home afterwards, Riddell gloated with Elizabeth Henriquez and her daughter, celebrating their successful fraud.  This time, the

---

[8] In exchange, Singer forgave the $75,000 bill to complete the Houston ACT cheating.

[9] Though he has acknowledged his role in the conspiracy, and pled guilty to the charged crimes, Manuel Henriquez continues to deny that he was complicit in the fake athletic recruitment. As set forth below, however, he issued the $400,000 payment to KWF.

Henriquezes paid Singer $25,000.  The fraudulent scores were submitted to Georgetown, where the Henriquezes' daughter was admitted and ultimately enrolled.

Still later, the Henriquezes arranged with Singer to cheat on their younger daughter's college entrance exams, which they caused her to take in Houston, Texas, at another test center Singer controlled through its corrupt administrator, Niki Williams.  During the exam, Riddell discussed answers to the questions with the Henriquezes' daughter and another student, but directed them to answer different questions incorrectly in an effort to conceal their cheating. Although Singer initially billed the family $75,000 for this fraud, Manuel Henriquez later agreed to use his influence at Northeastern to help secure the admission of another of Singer's students – whose parents paid Singer $250,000.

Unsatisfied with the score of 30 Riddell had earned on the exam, the Henriquezes arranged with Singer to cheat again during a second administration of the ACT exam, as well as on SAT II subject tests, which their daughter took over two successive weekends at the West Hollywood Test Center.  This time, they paid Singer in cash.  The fraudulent scores were submitted to Northwestern University, in Chicago, where the Henriquezes' daughter was admitted and ultimately enrolled.

## 2.  The Henriquezes' Bribery of Gordon Ernst

The Henriquezes also agreed with Singer to pay $400,000 to have Ernst designate their older daughter as a purported tennis recruit, thereby facilitating her admission to Georgetown.  In fact, the Henriquezes' older daughter did not play tennis competitively.

To facilitate the scheme, Singer directed the Henriquezes' daughter to send an e-mail to Ernst saying:

> I have been really successful this summer playing tennis around the country.  I am looking forward to having a chance to be part of the Georgetown tennis team and make a positive contribution to your team's success.

Elizabeth Henriquez told Singer that her daughter was "on it." Ernst – who by this point was receiving a stream of bribe payments from Singer to facilitate the fraudulent admission of his clients' children – forwarded this e-mail to an unsuspecting Georgetown admissions officer with a note: "Potential spot."

After the Henriquezes' daughter was admitted to Georgetown as a purported tennis recruit, Manuel Henriquez directed his banker to send a $400,000 "donation" to KWF. Singer, in turn, caused KWF to issue a receipt letter to the Henriquezes falsely stating that "no goods or services were exchanged" for the money. The Henriquezes later wrote off this payment as purported charitable donation on their 2016 tax returns.

### 3.   The Henriquezes Agreed to Cover-Up Their Crimes

On October 24, 2018, Singer called Elizabeth Henriquez at the direction of law enforcement agents and advised her that his foundation was being audited, and that "they asked me about the large sums of money that came in from you guys." The following is an excerpt from the call, which was consensually recorded:

| | |
|---|---|
| Singer: | So, of course, I didn't say anything-- you know, I'm not gonna tell the IRS that, you know, Mark [Riddell] took the test for [your older daughter] or that Gordie [Ernst]- |
| E. Henriquez: | Right.  Yeah. |
| Singer: | --or that Gordie-- you know, we paid-- |
| E. Henriquez: | Like--  Yeah. |
| Singer: | --Gordie to help her get into Georgetown, right? |
| E. Henriquez: | Right. |
| Singer: | So I just want to make sure that you and I are on the same page-- |

| | |
|---|---|
| E. Henriquez: | Okay. |
| Singer: | --in case they were to call. |
| E. Henriquez: | **So what's your story?** |
| Singer: | **So my story is, essentially, that you gave your money to our foundation to help underserved kids.** |
| E. Henriquez: | You-- **Of course.** |
| Singer: | And-- |
| E. Henriquez: | Those kids have to go to school. |

In January 2019, Singer met with the Henriquezes at their home. During the meeting, which was consensually recorded, Singer told the Henriquezes that Niki Williams, the Houston test administrator, had been subpoenaed to testify before a grand jury in Boston about students from out-of-state who had taken exams in Houston, including their daughter.

| | |
|---|---|
| M. Henriquez | Okay. **So why did [our younger daughter] do the test there [Houston]? So we gotta get into that story.** |
| Singer: | So -- uh, so lemme, uh, go into that. So you're right. That's -- that's part of it, right? So Niki [Williams] said to me, "Don't worry about it. You know, these are the outta-state kids. Essentially, there's nowhere where anybody knows..." Because in my books, it doesn't show that there was any money paid for Mark [Riddell] helping [your younger daughter] do the test. Okay? So there's nothin' . . . because we did the deal with the [Northeastern student] [for Northeastern]. So doesn't show anything at all, in our foundation or anything, just so you know. |
| E. Henriquez: | **So there's no paper trail of money.** |
| Singer: | There's no paper trail of money. Okay? 'Cause remember we did that? And you helped. So. |
| M. Henriquez: | **Right.** |

## II.     THE APPLICABLE SENTENCING GUIDELINES

For reasons articulated in its prior briefs, the government respectfully submits that the Sentencing Guidelines for these defendants should be calculated as follows, based on an application of Section 2B4.1 of the Guidelines: [10]

| Guideline | Elizabeth Henriquez | Manuel Henriquez | Douglas Hodge | Michelle Janavs |
|---|---|---|---|---|
| Base Offense Level (2B4.1) | 8 | 8 | 8 | 8 |
| Bribe Amount (2B4.1(b)(1)(B)) | +12 | +12 | +14 | +12 |
| Money Laundering (2S1.1(b)(2)(B)) | +2 | +2 | +2 | +2 |
| Acceptance of Responsibility (3E1.1(a)&(b)) | -3 | -3 | -3 | -3 |
| Total Offense Level | 19 | 19 | 21 | 19 |
| Sentencing Guideline Range | 30 to 37 months | 30 to 37 months | 37 to 46 months | 30 to 37 months |

The Pre-Sentence Report ("PSR") for Hodge takes a different approach – which the government assumes the Probation Department will apply to the other defendants – resulting in the following calculation:

| Guideline | Elizabeth Henriquez | Manuel Henriquez | Douglas Hodge | Michelle Janavs |
|---|---|---|---|---|
| Base Offense Level (2S1.1(a)(1)) | 6 | 6 | 6 | 6 |
| Money Laundering (2S1.1(b)(2)(B)) | +2 | +2 | +2 | +2 |

---

[10] The government has briefed the applicable Guidelines in connection with the sentencings of the defendants' co-conspirators. *See United States v. Abbott, et al.*, No. 19-10117-IT (D. Mass.), Dkt. 422 (Government's Memorandum Regarding the Methodology for Calculating Gain or Loss Under the Sentencing Guidelines); *United States v. Bizzack*, No. 19-10222-DPW (D. Mass.), Dkt. 25 (Government's Sentencing Memorandum); *United States v. Macfarlane,* No. 19-cr-10131-NMG (D. Mass), Dkt. 334 (Government's Sentencing Memorandum). The briefing from those matters is included in the Appendix B hereto, and incorporated herein by reference.

| Guideline | Elizabeth Henriquez | Manuel Henriquez | Douglas Hodge | Michelle Janavs |
|---|---|---|---|---|
| Acceptance of Responsibility (3E1.1(a)) | -2 | -2 | -2 | -2 |
| Total Offense Level | 6 | 6 | 6 | 6 |
| Sentencing Guideline Range | 0 to 6 months | 0 to 6 months | 0 to 6 months | 0 to 6 months |

While the government continues to disagree with the PSR's calculation of the offense level for conspiracy to commit wire fraud and honest services fraud, there are two additional issues that warrant the Court's attention.

### A.    Section 2S1.1 Requires Direct Money Launderers to be Punished More, Not Less, Than Offenders Who Commit Only the Underlying Offense

The PSR's calculation of the offense level for money laundering is inconsistent with the way money laundering Guidelines have long been calculated in this District, and also inconsistent with the way the Guidelines are calculated in other Circuits.

In analyzing the fraud conspiracy as a standalone count, the PSR calculates the base offense level as 7, because each defendant was convicted of an offense that the PSR contends is appropriately referenced to Section 2B1.1 – conspiracy to commit mail and wire fraud and honest services mail and wire fraud – and that offense has a statutory maximum term of imprisonment of 20 years or more. *See, e.g.*, Hodge PSR ¶ 126b.  But when calculating the base offense level for money laundering, the PSR erroneously uses a *lower* offense level of 6 for the same underlying fraud conspiracy.  To reach this conclusion, the PSR incorrectly assumes that the base offense level is calculated by reference to the money laundering statute, rather than by reference to the underlying fraud. *See, e.g.*, Hodge PSR ¶ 127.  By this logic, laundering the proceeds of a fraud will always result in a base offense level for money laundering that is *lower* than the offense level

for the underlying fraud.  This makes no sense and is precisely the opposite of what the Guidelines intend.

The express purpose of Section 2S1.1 is to impose "*additional* punishment for committing *both* the money laundering offense *and* the underlying offense."  *See* Guidelines Supp. to Appx. C ("Commission Policy"), amend. 634, at 229 (Nov. 1, 2001), *available at* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2001/manual/APPCSUPP.pdf (emphasis added).  Accordingly, in adopting Section 2S1.1, the Sentencing Commission made clear that it sought to ensure that "all direct money launderers will receive an offense level that is one to four levels *greater* than the Chapter Two offense for the underlying offense."  *See id*. at 235 (emphasis added).  To accomplish this mandate, the Commission directs courts to set the base offense level for direct money launderers "at the offense level in Chapter Two (Offense Conduct) for the underlying offense (*i.e.,* the base offense level, specific offense characteristics, cross references, and special instructions for the underlying offense)," *before* applying the enhancement for money laundering.  *Id.* at 229.

In other words, Section 2S1.1(a)(1) requires that *before* turning to the money laundering guideline, "the court first ha[s] to calculate the sentence as it would have applied to the [underlying counts] *standing alone*, making reference to [the guideline for the underlying offense]."  *United States v. Cruzado-Laureano*, 440 F.3d 44, 48 (1st Cir. 2006) (emphasis added).  As the Seventh Circuit has made clear, "Adding levels for 'all' direct launderers is possible only if . . . § 2S1.1(a)(1) plugs the full offense level for the substantive guideline into the 'base' level for money laundering."  *United States v. Hodge*, 558 F.3d 630, 637 (7th Cir. 2009).

The PSR's contrary approach, which results in a *lower* offense level for money laundering, has been rejected by courts in multiple circuits.  *See, e.g.*, *United States v. Salado*, 590 Fed. Appx.

692, 693 (9th Cir. 2015) (base offense level 7 where defendant convicted of money laundering offense and an offense referenced to Section 2B1.1); *United States v. Nikolovski*, 565 Fed. Appx. 397, 401-02, n.4 (6th Cir. 2014) (same); *United States v. Mirzoyan*, 2017 WL 1501394, at *18 (S.D.N.Y. Apr. 26, 2017) (same).  As the Seventh Circuit has explained:  "Using the guideline (including its adjustments) for one offense as the 'base' level for another [*i.e.*, § 2S1.1(a)(1)] is an unusual approach, but it has the support of the Commission's own explanation" – that courts must use "the complete substantive guideline" including all "cross references, and special instructions *for the underlying offense*."  *Hodge*, 558 F.3d at 637 (emphasis added); *see also United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010) ("The total Guidelines offense level for such 'underlying offense,' *after being independently calculated* by applying all appropriate adjustments . . . is then used as the base offense level for money laundering . . . .") (emphasis added).

Likewise, in this District, the Probation Department has typically calculated the base offense level for direct money launderers, such as these defendants, to be 7 – *not* 6, as the PSR proposes in this case.  *See, e.g.*, *United States v. Patel,* No. 19-cr-10381-LTS (D. Mass. Jan. 13, 2020) (calculating underlying fraud offense base offense level to be 7, not 6, for a direct money launderer); *United States v. Eze*, No. 19-cr-10352-LTS (D. Mass. Dec. 30, 2019) (same); *United States v. Amaral*, No. 18-cr-10187-DPW (D. Mass. Feb. 1, 2019) (same); *United States v. Abell,* No. 17-cr-10332-NMG (D. Mass. Jan. 4, 2019) (same); *United States v. Miller*, 16-cr-40026-TSH (same); *United States v. Nguyen*, No. 15-cr-10229 (D. Mass. July 18, 2018) (same).  There is no reason to change course now.

B.    **An Upward Departure is Warranted for these Defendants**

Beyond its calculation of the applicable money laundering guidelines, the PSR's calculation of the Total Offense Level substantially understates the seriousness of the defendants'

offenses.  *See* Application Note 21(A)(i) to Section 2B1.1 (allowing for upward departures when, as here, "a primary objective of the offense was an aggravating, non-monetary objective").  As set forth below, upward departures are appropriate here because these defendants:

- Repeatedly engaged in serious criminal conduct over the course of an extended period;

- Actively participated in the scheme;

- Allowed their children to become complicit in their crime;

- Occupied, and in some cases abused, positions of trust during the commission of the offense; and

- Subsidized their crime at the expense of the American taxpayer by fraudulently deducting their bribe payments from their income taxes.

Based on their relative culpability, the government respectfully recommends upward departures of between 8 and 10 offense levels, as set forth below:

| Guideline | Elizabeth Henriquez | Manuel Henriquez | Douglas Hodge | Michelle Janavs |
|---|---|---|---|---|
| Court Guideline[11] | 7 | 7 | 7 | 7 |
| Upward Departure or Variance | +10 | +8 | +10 | +9 |
| Total Offense Level | 17 | 15 | 17 | 16 |
| Sentencing Guideline Range | 24 to 30 months | 18 to 24 months | 24 to 30 months | 21 to 27 months |
| Term of Imprisonment Recommended by Government | 26 months | 18 months | 24 months | 21 months |
| Fine Recommended by Government | $250,000 | $150,000 | $200,000 | $175,000 |
| Supervised Release Recommended by Government | 3 years | 2 years | 3 years | 3 years |
| Community Service Recommended by Government | 300 hours | 250 hours | 300 hours | 250 hours |

[11] The "Court Guideline" assumes that the Court adopts the PSR's calculation of the Section 2B1.1 guidelines, as it did in sentencing defendant Toby Macfarlane, reflecting no enhancement for gain or loss.  The calculation nonetheless assumes that the Court will calculate the total offense level for money laundering as 7, for the reasons set forth above.

### III.   THE DEFENDANTS' CRIMINAL CONDUCT REQUIRES A MEANINGFUL TERM OF INCARCERTATION

In fashioning an appropriate sentence, courts consider the factors set forth in 18 U.S.C. § 3553(a), including the seriousness of the offense, the history and characteristics of each defendant, the need for the sentence imposed to constitute just punishment and provide for adequate deterrence, and the importance of avoiding unwarranted sentencing disparities among similarly situated defendants.  The government has considered these factors, along with other measures of culpability discussed below, to fashion sentencing recommendations that take account of the individual circumstances of each defendant and reflect their relative culpability in the context of their parent co-conspirators.

### A.   The Seriousness of the Offense:   The Defendants Were Active and Repeat Participants in the Criminal Conduct Over an Extended Period of Time

As the government has previously noted with respect to other members of the conspiracy, the defendants intentionally corrupted the standardized testing and college admissions process to steal admissions slots from more deserving applicants.  They thus directly cheated honest, diligent students out of admission in favor of their own, less qualified children.  In this way, their crime caused both systemic harm – by undermining public trust in the educational system – and individualized harm, inflicting financial and reputational harm on the universities they targeted, and stealing lifelong economic opportunities from other college applicants.

The defendants paid staggering sums of money to participate in the fraud.  Hodge paid $850,000, the Henriquezes agreed to pay more than $530,000, and Janavs agreed to pay $300,000. These amounts, even if they are not formally factored into the calculation of the sentencing guidelines, are significant in assessing relative culpability, because they provide a measure of the value the defendants themselves placed on the fruits of their scheme.  Singer and his network of

corrupt test administrators, test takers and university insiders set the price, to be sure.  But the defendants willingly paid that price, haggling in some instances, but generally agreeing with him that what they were getting was worth what they were paying.  Just as drug weight provides a proxy for a drug dealer's culpability, and victim losses provide a rough guide to the Ponzi schemer's harm, so, too, do the bribes and other payments these parents paid serve as a starting point, however imperfect, to assess their wrongdoing.

At least as important is the fact this was not a one-off fraud for any of these defendants.  All were repeat players, who engaged in the scheme again and again, over years.  Hodge did it five times over nearly 11 years.  The Henriquezes did it six times over two years.  And Janavs did it three times over nearly two years.  Simply put, no other parents engaged in the scheme more than these defendants.

One of the scheme's earliest participants, Hodge successfully targeted two separate universities on opposite coasts.  Initially, he sent bribes directly to Ernst, the Georgetown tennis coach.  And as the scheme grew more sophisticated – with some of the payments funneled through Singer's sham charity – Hodge assured Singer that they didn't need to "talk in code."  As he put it:  "I know how this works."

Likewise, the Henriquezes were Singer's most prolific exam cheating clients, recommitting to the scheme on five separate occasions for their two daughters, and then recommitting a sixth time by bribing Ernst to secure their daughter's admission to Georgetown as recruit for a sport she didn't play competitively.  And Janavs, having cheated on standardized tests once for her older daughter, and arranged with Singer to use bribes to secure her admission to USC as a fake beach

20

volleyball recruit, asked Singer to arrange for yet another round of exam cheating for her younger daughter even as the sham recruitment process was still underway.

The defendants were also active and engaged participants in the fraud.  For example, when Singer told Hodge that he needed pictures of his younger son playing a sport – tennis, football, *or* basketball – Hodge directed his personal assistant to gather and send the photographs (which ultimately included photos of a different son) for inclusion in the falsified football profile submitted to USC.  Hodge also personally assured Heinel that "[w]e are preparing [my younger son]'s 'sports resume' as you requested and should be ready to send it on to you early next week."  And when Singer informed Hodge that KWF was being audited by the IRS, Hodge promised Singer that he didn't "have to worry. . . .  I'm not going off script here."  Hodge reminded Singer that he "didn't talk money" with Heinel.  As Hodge put it:  "[W]e're kind of talking in code here."

Janavs likewise helped Singer create a falsified athletic portfolio for her older daughter by providing him with photographs of her daughter playing volleyball.  And after her daughter was admitted to USC as a purported athletic recruit, Janavs, on her own initiative, concealed her admission from the university's development officials.  Reporting back to Singer, Janavs assured him that she had not "open[ed] up a can of worms" about the fact that her daughter had been fraudulently admitted as a purported athlete – or, as Janavs put it:  "[S]he's there but she's playing athletics but she's not but she is."  Janavs also agreed to mislead her daughters' high school, where she served on the board of trustees, about why her children needed to take their college entrance exams at Singer's facility in West Hollywood.

Similarly, Elizabeth Henriquez affirmatively misled her older daughter's high school counselors about why she needed to use Singer's proctors for her daughter's exams – telling the school that the proctors (who purported to assist her daughter by acting as "readers" during the

exams) had developed "a good cadence and pace" with her.  Elizabeth Henriquez, while on jury duty, also ensured that her daughter sent Ernst the e-mail Singer requested, falsely affirming her desire to play tennis at Georgetown.  And, when Singer alerted the Henriquezes that there was a federal investigation into his Houston testing facility, Manuel Henriquez sought to make sure that the conspirators had their cover stories straight, telling Singer:  "Okay. So why did [our younger daughter] do the test there [Houston]?  So we gotta get into that story."

In all these ways, the defendants deliberately, purposefully, and repeatedly committed fraud, over *years*, spending whatever it took, lying as needed, and demonstrating a callous disregard for the law, as they worked to reap the illicit fruits of their scheme.

### B.      The Defendants Allowed Their Children to Become Complicit in Their Crimes

The defendants also made their children complicit in their crimes, blithely placing them in legal jeopardy and violating one of the most basic principles of parenting:  don't teach your kids to break the law.

As just one example, Hodge allowed Singer to counsel his daughter to "stay under the radar" and not "say anything" during her Georgetown interview about having already been admitted through tennis.  Elizabeth Henriquez likewise caused her older daughter to send a false e-mail to Ernst to facilitate her fraudulent recruitment as a tennis player – and, earlier, gloated with that same daughter, in the car with Riddell, after they cheated on a college entrance exam.  On one occasion, Singer specifically informed the Henriquezes that he had directed their younger daughter to draft "a new absolutely BS great story about her origin," that was later submitted to Northwestern University, where she eventually enrolled.  And Janavs confided in Singer that her older daughter had cautioned her not to let her younger daughter in on the scheme, remarking:

"And [my older daughter] came to me and she says, 'You're not going to tell [my sister], are you?' I was like, 'No.'"

### C.       **The Defendants Occupied Positions of Trust**

Hodge, Janavs, and Manuel Henriquez each occupied positions of trust in their communities.  Hodge was the chief executive of one of the world's largest asset management firms, charged with safeguarding the retirement savings of millions of Americans.  He also served, alongside Janvas, on the board of trustees of their children's high school.  Notwithstanding those roles – each of which is associated with the presumption that its occupant is a person of integrity – Hodge was living a secret double life, using bribery and fraud to fuel a mirage of success and accomplishment.

Janavs, for her part, used her trustee's position to insulate herself from the fraud, telling Singer that she would lie to the school about why her daughter needed to take an exam elsewhere, and boasting, "They can't say anything to me."

And Manuel Henriquez, the chief executive of a publicly traded company – whose job, like Hodge's, entailed responsibilities to investors, employees, and business counter-parties – used his position as a prominent alumnus and former member of the corporation at Northeastern University to advance the admissions prospects of another Singer client, in exchange for a discount on the cost of cheating on his younger daughter's ACT.

The positions of trust the defendants occupied came with heightened responsibilities.  For years, they purported to be leaders and role models.  Their disregard for those positions in favor of a scheme to lie, cheat and bribe their children's way into college is a significant aggravating factor in assessing their culpability.

### D.      <u>The Defendants Used Fraudulent Tax Deductions to Subsidize Their Scheme</u>

In the course of their scheme, Hodge and the Henriquezes also lied to the IRS by deducting bribe payments from their income taxes as purported charitable donations.  This fact is particularly troubling given that Hodge and Manuel Henriquez were, as noted, international leaders of business, whose companies managed colossal sums of other people's money.  And Henriquez's company was, as noted, publicly traded.

This additional conduct, though uncharged, is yet another significant aggravating factor.  Tax fraud is among the easiest of crimes to commit, and the most difficult to detect.  And the opportunity presents itself year after year.  The nonchalant willingness of these titans of business to cheat on their taxes, even as they were also committing other serious crimes, underscores the need for a significant sentence of incarceration that provides for both specific and general deterrence.

<u>CONCLUSION</u>

Fueled by arrogance and entitlement, the defendants' actions demonstrate a stunning disregard for basic principles of fair play and common decency.  Over and over, they sought to arrogate to themselves, using money and lies, that which others work hard to achieve.  Such brazen criminality requires just and certain punishment:  prison, for a meaningful term.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:      */s/ Justin D. O'Connell*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Date: February 3, 2020          Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by CM/ECF on February 3, 2020.

*/s/ Justin D. O'Connell*
JUSTIN D. O'CONNELL