**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CR-10080-NMG |
| | ) | |
| | ) | |
| DAVID SIDOO, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MICHELLE JANAVS'**

**SENTENCING MEMORANDUM**

Leave to file granted on February 14, 2020 [Dkt. 854]

## I.    INTRODUCTION

Michelle Janavs stands before the court as a result of her own choices.  Presented with an opportunity to get an illegal advantage for her children in the college admissions process, she took it.  She takes full responsibility for her actions, and she blames only herself.

Michelle was not born to wealth or privilege.  Her father, an immigrant from Iran, worked 12 hours a day, six or seven days a week, to build a frozen food business while supporting his family.  It was not glamorous.  In the early days the business operated from their home kitchen.  Michelle watched her father sacrifice, struggle, and fail for years before he ultimately succeeded.  He had three mortgages on the family home.  The lessons Michelle learned early in life about sacrifice and perseverance stuck with her and have been passed down to her children.

Supported by the wealth created by her father's successful business, Michelle has dedicated her life to helping others.  In addition to raising three kind and respectful children, Michelle has undertaken a 17-year campaign to end childhood hunger in her community.  She created innovative programs encouraging teenage students to write inspirational children's books, then managed the publication of those books and spent hundreds of hours personally selling them and donating the money to child hunger charities. She also created a clever donation program that motivated children not only to donate spare change but to encourage other kids to do the same.  Michelle's hands-on, high-impact volunteer work has helped generate over 1.2 million meals for children who would otherwise have gone to school hungry.  But perhaps more important, she has inspired kindness and generosity in others and cultivated a new generation of philanthropists.

Michelle has also dedicated her time and resources to closing the opportunity gap between wealthy and working-class kids.  Her support of El Sol Science & Arts Academy, a charter school in Santa Ana, California, has provided hundreds of children access to high-quality early education.  And Michelle has provided scholarships and other support to give less privileged children

opportunities to go to college.   Until she met Rick Singer, Michelle showed, by her words and actions, a sincere desire to provide all students with the same educational opportunities as her own children.

As the dozens of letters attached here attest, Michelle is a singularly kind, loving, and compassionate person.   Her generosity touches everyone she meets.   ███████████

███████████████████████████████████████████████████████████████

███████████████████████████ When Michelle heard that another employee's child was bullied walking home from school, Michelle pulled the boy out of that school and enrolled him at the same private school her kids attended at her own expense.   ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

Unlike many of the parents involved in this case, Michelle does not occupy a position of power or executive-level responsibility.   Her goal in life was to be a mother and caregiver.   She has not been in the gladiator pit of business or the spotlight of fame.   She is also an exceedingly trusting person.   This made her an ideal target for Rick Singer.

Also, unlike many parents in this case, Michelle was not motivated by ambition or pride. She did not seek out Rick Singer to help her cheat in the admissions process.   She had no agenda of getting her kids into a particular brand-name or elite college.   Her children probably would have been admitted to a college that was a good fit for them without anyone's help.

But as Michelle and her children entered the college application season and experienced the anxiety of competing for an increasingly small number of admissions slots, Singer convinced Michelle that her children would not be admitted to the right college without his help.   Millions of families experience the same anxiety and don't cheat.   And many of Singer's clients resisted

Singer's manipulative sales tactics.   But many parents didn't, including parents with more sophistication and life experience than Michelle.   This speaks to both the immense anxiety that the college admissions process creates and to the persuasive power of Rick Singer.

Michelle understands that her actions exacerbated the same kind of inequality that she has spent her life trying to counteract.   She expects and deserves to be punished by this Court for what she has done.   But no punishment this Court could impose will be as harsh as Michelle's punishment of herself.   She experiences searing remorse for what she did, every single day.

Michelle's conduct has also had devastating consequences for her children.   Both of her daughters were banned from their high school, a vital source of community and identity.   Her older daughter ███ a high school senior, was not permitted to graduate with her class.   Nor was she able to attend a four-year university.   Her younger daughter ███ a junior, had to change schools during a vulnerable period in her life.   Michelle must live with the fact that she brought these harms on her children, and in doing so lost the moral authority she once had.

But despite what she has done, Michelle is still the glue that holds her family together. ███

████████████████████████████████ ███

████████████████████████████████████

█████████████████████████████

## II.    MICHELLE'S BACKGROUND

Michelle grew up in a modest home in the San Fernando Valley, a suburb of Los Angeles. Her father, Paul Merage, was an entrepreneur and businessman.   Her mother, Lilly Merage, was a homemaker.   **Ex. 4** (Lauren Merage).   Michelle was raised to be a strong, hardworking, and caring person.   She saw her father's work ethic and learned that success does not come easily.   One of Michelle's first memories is the smell of frozen waffles.   Recognizing the increase in single parents who did not have the time or resources to prepare fresh meals, Michelle's father set out to invent

frozen food products that could be prepared in minutes.  What began as a frozen waffle company operated out of the family's home kitchen later evolved into Chef America, which created the now-ubiquitous Hot Pocket.

Building that company required tremendous sacrifice.  Paul carried three mortgages on the family home, and during the early stages of the business he often worked 12 to 15 hour days.  "As a child and young adult Michelle lived within tight financial constraints."  **Ex. 2** (Paul Merage).  "We were fortunate to have a roof over our heads and food on the table, but there was no room for extras." *Id*.

Michelle was a good student and was admitted to the University of Southern California.  She studied psychology and graduated in 1993.  After college, Michelle worked in a home for battered women, counseling the victims of domestic violence.  Michelle then worked at an entry-level position in the marketing department of Chef America.  As the boss' daughter, Michelle had to work harder than everyone else and produce better results than anyone else in order to prove herself.  Her supervisor noted that Michelle "displayed more good character, commitment, and passion for our business than anyone else on our team."  **Ex. 16** (Rob Nelson).  But Michelle had neither the desire nor the competitive instinct to succeed in business.  From an early age, Michelle knew that her only goal was to be a successful mother and good person.

As her friend of 40 years notes:

> In high school as we were choosing colleges that fit our hopes for a future career, I remember Michelle clearly telling me that all she wanted was to become a mom. . . . And that sums it up:  her life focus – even before having children – has always been to create a loving family and be there for her children.

**Ex. 26** (Ara Tokatyan).  When her oldest son was born in 1998, Michelle left her job to focus on being a mom.  She also began a lifetime of charitable work that continues to this day.

## A.     Kindness and Generosity

In the dozens of letters submitted on her behalf, the words most commonly used to describe Michelle are selfless, kind, and generous.  *See, e.g.,* **Ex. 9** (Farnaz Elist) ("Michelle has always been the kindest, most humble, compassionate, and caring person I have ever known."); **Ex. 44** (Kaleen Lugo) ("Michelle is one of the most earnest, sincere, pure intentioned people I have ever met."); **Ex. 37** (Laura Choumas) ("There has been a silent hand on her shoulder that has always directed her to doing what is best for others."); **Ex. 4** (Lauren Merage) ("Michelle has . . . made it her life's work to take care of others."); **Ex. 12** (Jennifer Segerstrom) ("[S]he gives selflessly and tirelessly in everything she does."); **Ex. 3** (Paul Janavs) ("It does not matter who it is, but for over twenty years, if someone needed help, Michelle always stepped up to give her time, assistance and love."); **Ex. 25** (Vaga Haviland) ("She goes out of her way to help children and families in need."); **Ex. 28** (Susan Etchandy) ("I've come to admire Michelle's big-hearted, loving and generous nature towards her family and friends."). **Ex. 6** (Dzintra Janavs) ("Amazingly, with seemingly inexhaustible energy, Michelle also always found time to help family members and others in crises when the need arose."); **Ex. 7** (Jina Janavs) ("[S]he has always been loving, attentive, and devoted to her family and caring and respectful to friends and strangers alike."). Michelle's kindness dates to her earliest years.  As her cousin, Greg Merage notes, "[t]hroughout our childhood she went out of her way to make sure all the family children were included in events and games.  She would always help the kids that couldn't keep up.  Even if it meant Michelle missing an event or losing a game, she put others first."  **Ex. 5** (Greg Merage).

Michelle's kindness has touched dozens of people, but three instances stand out.

### i.     ███████████

One day in 2005, Michelle's housekeeper, Evelyn "Patty" Ramirez, came to work with tears in her eyes.  She told Michelle that her son ███████ who was in fourth grade, was being

bullied and threatened on his way to school.  Michelle immediately placed a call to the Kline

School, the private school that her children attended.  She persuaded the school to make space for

███████ the same day, and he never returned to his previous school.  Michelle paid for ███████

tuition and books and from that point on ███████ went to school every day with Michelle's kids.

███████ went from a classroom of about 32 children to a class with about 10.  **Ex. 23**

███████████████  As ███████ describes it, the Kline school was "[a] complete 180 degrees

from the public school I had just attended."  *Id*.  As Patty remembers, "███████ was a pretty shy

kid at that point.  But he started coming out of his shell after a few months at the new school." **Ex.**

**22** (Evelyn Ramirez).  For the first time, ███████ took an interest in reading.  Patty remembers

finding ███████ in his room, under the covers with a reading light and a book.  When Patty's

daughter was ready to start kindergarten, Michelle enrolled her in the Kline school also.  ███████

is now 24 years old and a member of the United States Air Force Reserve.

> Michelle Janavs is selfless.  She did not have to do anything for me or my parents
> but she wanted to.  She never got anything out of this other than personal pleasure.
> This is what separates her from everyone else.  She is truly one of the kindest people
> I've met and just like she treated me like one of her own, I looked at her like a
> mother.  She showed me nothing but love through all those years.  She motivates
> me to one day be as successful as they are so that I can give back to others as well.

**Ex. 23** ███████████████

### ii.      Mari Estrada

A few years later, the family's subsequent housekeeper, Mari Estrada, suddenly felt pain

in her stomach.  Her doctors could not determine what was wrong.  Michelle went with Mari to

the health clinic to advocate for her and make sure that the doctors were giving her the best care

available.  **Ex. 22** (Evelyn Ramirez).  Michelle's perseverance, and her willingness to pay for

expensive diagnostic tests and treatments, may have extended Mari's life for a short time.

██████████████████████████████████████████████████ From that

moment on, Michelle went with Mari to every doctor's appointment.  As Valentin Lopez, a

property manager for the Merage family notes, "Michelle was always with her." **Ex. 33** (Valentin

Lopez). "She was available to Maria 24-hours a day. I remember that there were times that she

got up at 2:00 in the morning to go to see her because she was not well." *Id*. When it was clear

that ██████ would not make it, Michelle stayed and cried with her until she passed away. *Id*.

          **iii.**        ██████████████

██████████████ was a scholarship student at Sage Hill School and one of ████████

teammates on the volleyball team. The girls met freshman year and became best friends. But

████████ lived far from the school and lacked the resources to participate in some of the school's

activities. Michelle welcomed ████████ into her home. As ████████ mother Vaga notes,

"Michelle became a second mother to my daughter . . . and the Janavs family became her second

family." **Ex. 25** (Vaga Haviland). "She loves and cares for ████████ as if she were her own." *Id*.

> Michelle made sure that ████████ always had a place to rest, eat, and get ready for
> school if she could not make the bus home due to her late after school activities.
> She assured me that I never needed to worry about picking her up late, that my
> daughter always had a place to stay. They even gave my daughter a key to their
> home, should she need to go by the house for any reason.

*Id*. ████████ was admitted to an East Coast college on a volleyball scholarship and had to report

for training last summer. Due to Vaga's difficult work schedule, Vaga asked Michelle if she was

planning any travel during that time on the East Coast. "Without hesitation" Michelle offered to

take ████████ to college.[1] *Id*. As Vaga later found out, Michelle had no pre-existing plans to travel

to the East Coast, and she made a special trip for that purpose. "That is Michelle. She is always

willing to lend a hand, to help others. I know how much my daughter appreciated this act of

kindness and has so much love for Michelle for being a loving second mother to her." *Id*.

---

[1] Michelle's offer to take ████████ to college to start her volleyball training has special significance
because it took place only months after Michelle was arrested in this case, and after ████████ who
played volleyball with ████████ had to withdraw all of her college applications.

### B.   Caring for Family

The other quality that stands out in the letters is Michelle's unwavering commitment to caring for her family.  As her lifelong friend observes, "[s]he's been the rock of the family in difficult times – always actively putting her family's welfare first."  **Ex. 26** (Ara Tokatyan); *see also* **Ex. 35** (Terra Singer) ("She is the matriarch and the care taker.  Each member [of her family] turns to her for everything and anything."); **Ex. 5** (Greg Merage) ("Michelle is the rock [of] her family, as well as her extended family."); **Ex. 19** (Rabbi Arnold Rachlis) ("In addition to being a tirelessly devoted mother, she has been willing to sacrifice her own well-being to support all others in her family in times of need."); **Ex. 32** (Melissa Petrus) ("Michelle has always been the pillar that her family has leaned on . . . She has been the glue that has kept the family together."); **Ex. 31** (Melissa Knode) ("I have never witnessed anyone, friend or acquaintance, dedicate all of their time and take action as the head of the family the way Michelle did.").

### i.   Lilly Merage



9



ii.



### C.      Philanthropy and Community Involvement

Michelle has dedicated enormous amounts of time, creativity, and money to dozens of worthwhile causes, but her primary focus has been helping disadvantaged children thrive and teaching generations of school children the importance of volunteering and giving to others.

### i.      Second Harvest Food Bank

In 2003, Michelle began what became a 17-year campaign to end childhood hunger in her community.  It started when Michelle got involved with the Harvesters, a group of dedicated and compassionate women that banded together to raise funds to support the Second Harvest Food Bank of Orange County.  Due in part to Michelle's effort and organization, the Harvesters have raised millions of dollars each year to support the programs at Second Harvest.  Michelle's contributions were not limited to donating money and fundraising.  Michelle "interacted personally with the individuals and families that came to the Food Bank for food assistance.  She wanted to hear their stories and understand their circumstances." **Ex. 11** (Jennifer Van Bergh).  Inspired by these stories, Michelle volunteered her time and creativity and inspired many others to do the same.  And she involved her children to give them perspective on the privilege and food security they enjoyed and reinforce their obligation to help others who are less fortunate.

### ii.      Kids Café

One of the first programs Michelle helped develop was the Kids' Café. *Id*. The Kids' Café program filled a crucial gap for hungry kids who receive free or reduced lunches at school, but still

suffer from food insecurity after school, on weekends, and during breaks in the school year.  The program provides backpacks full of non-perishable food for kids to take home.

There are now 35 Kids Café sites throughout Orange County, and they provide over 1,700 children with after school snacks five days a week.  During the summer, the Kids Café provides breakfast, lunch and afternoon snacks to over 3,300 children.

### iii.    *Izzy and the Candy Palace*

In 2009, Michelle brought ▮▮▮ who was nine years old, to the Second Harvest Food Bank.  Inspired by what she saw and experienced there, ▮▮▮ decided to write a children's book, and then use the proceeds from the sale of the books to provide meals for hungry kids.  Although Michelle had no experience in publishing, she was determined to make ▮▮▮ idea a reality.  The result was *Izzy and the Candy Palace*.  Michelle managed every part of the process from editing the story, to publishing it, and marketing the books.  The book was finished in time for the holiday shopping season in 2010 and Michelle spent several days a week manning a table at a local shopping center selling the book to shoppers.  100% of the profits from the book sales went to support the Kids Café program.  The sale of each book provided 27 meals for hungry children.



12

The book was so successful that Michelle expanded the program to other kids in the community by sponsoring a writing contest.   Every other year, Michelle solicited writing contributions from children in local schools in grades 2-8.   The winners were selected by an editorial board made up of authors, illustrators and editors.   The winning child's story was professionally edited, illustrated, and published as a book for retail sale.   Each year Michelle and her kids spent hours at a table at the local shopping center selling the books to holiday shoppers.

The four books Michelle published – *Izzy and the Candy Palace*, *Red Rocker's Hairy Day*, *Doxie*, and *No! No! No!* have generated more than $275,000 to fund the Kids Café and the Second Harvest Food Bank.   The proceeds have translated into over 820,000 meals for hungry kids.   And through their participation in the program, generations of schoolchildren have learned about food insecurity in their community and been encouraged to take steps to address it.

### iv.     Izzy's Corner

In 2014, Michelle refurbished a section of the Second Harvest Food Bank distribution center and transformed it into a space for children to learn about childhood hunger.  Called Izzy's Corner, the space was designed to give kids a hands-on experience helping other kids.  After a tour



of the Second Harvest facility, children volunteers pack backpacks full of nutritious food and help distribute them to kids in need.  Michelle took charge of every aspect of Izzy's Corner, from cleaning and restoring the space, to painting it, to stocking and distributing food.  **Ex. 10** (Joe Schoeningh); **Ex. 29** (Rebecca Stanton) ("What made Michelle different was that she did not just throw money at charities – she started one, actively ran it, and participated fully in every aspect of it – not just the fancy parties, but also the very dirty cleaning up of Izzy's Corner . . . .").  Michelle's contribution to Izzy's Corner was honored in 2014 with the Second Harvest Food Bank of Orange County's Founder's Legacy Award.  See **Ex. 48**.  Izzy's Corner remains fully operational today.  During the six years that Izzy's Corner has been open, over 5,000 kids have visited and have been inspired to help others.  *See* **Ex. 57** (Izzy's Corner – Second Harvest Food Bank Video).[2]  Executive Director Joe Shoeningh notes, "Just this week, I saw Michelle at a modest soup-kitchen-style lunch in the distribution center to recognize and award long-time supporters and volunteers.  Even in the middle of this criminal case, Michelle took the time to come and support our initiatives to tackle child hunger."  **Ex. 10** (Joe Schoeningh).



### v.        The Paper Palace Program

The Paper Palace program was an effort to further educate elementary school-aged kids on childhood hunger and food insecurity and cultivate generosity.   Beginning in 2012, Michelle designed and distributed instructions and cutouts for children in local elementary schools to make paper houses called "Paper Palaces."   Each bore the pledge "[e]ach time that I give to another kid who is less fortunate than I am, I am rewarded a thousand times over."   **Ex. 49**.   Kids took the Paper Palaces home, put them on their dinner tables, and dropped a coin in each time the family ate a meal.   Then the Paper Palaces were returned to their schools so that the coins could be counted, and the proceeds given to the Second Harvest Food Bank.   Michelle personally spent hours counting, rolling, and packaging the coins to take to the Second Harvest Food Bank.   Once the coins were totaled, Michelle would conclude the program by going back to the schools with oversized checks she created.   She would present the checks to the students at a special assembly

---

[2] Available on-line at https://www.youtube.com/watch?v=WKbvOTWnNs8

where she would continue to educate them on child hunger, congratulate the children on the money they raised, and explain how it translates to meals for other kids in their community.



### vi.        El Sol Science and Arts Academy

Michelle was also an early and generous supporter of El Sol Science and Arts Academy in Santa Ana, California.  As Executive Director Monique Daviss notes, Michelle understood how privilege and wealth provided opportunity for her own children and wanted to level the playing field by providing the same opportunity for other kids.  "She wanted to do things to make a difference. As she saw her children grow up, she wanted other children to have the same opportunities as her own children had . . . ."  **Ex. 14** (Monique Daviss).  Again, Michelle's contributions to El Sol were not limited to fundraising.  Michelle worked with El Sol to open a pantry on the grounds of the school so underprivileged families could get food there for free.  And "[h]er daughter ███ donated her Candy Palace books, read to children and initiated a link between Second Harvest Food Bank and El Sol that continues today."  *Id*.

Michelle took her support to another level when she provided a four-year scholarship for an El Sol student to attend Sage Hill School, the same school her children attended. That student is now studying at the University of California Irvine in hopes of becoming a doctor. Michelle's generosity shaped the student's future forever. As the student describes in her letter, "[a]ll of the skills I learned at Sage Hill continue to help me on a daily basis." **Ex. 15** (███████).

## III.   THE CIRCUMSTANCES OF THE OFFENSE

Michelle met Singer in the Fall of 2016. He was recommended because of his understanding of the college application process and his reputation for motivating kids to succeed. Michelle did not reach out to Singer with the intention of cheating, nor did she know that it was possible. She trusted him, like she often trusted others. *See* **Ex. 26** (Ara Tokatyan) (Michelle's "open and somewhat gullible nature" has caused her to be "naïve and overly-trusting.").



Before Michelle met Singer, she had no agenda of getting her kids into a particular brand-name or elite college. In 2016, ███ was a junior in high school. She was a hard worker and conscientious student who played volleyball for her high school team. ████████

████████ By the time she was a junior in high school, her GPA was 3.57. **Ex. 50** (Report Card). ███ had been recognized for her contributions to ending childhood hunger with the Second Harvest Food Bank. In 2017, ███ was one of five winners of the Montage Memory

Makers contest, which recognized children who "use their kindness and intelligence to help others in their communities." **Ex. 51** (Altruistic All Stars).  Michelle had confidence in her.

But Singer changed all of that.  Singer's scheme, in a nutshell, was to persuade parents that their child needed to go to a particular elite school (where Singer had connections with corrupt coaches and administrators).  He then convinced the parents that their child would never get admitted to that school without his help.  That is what happened in this case.  Having persuaded Michelle that USC was the best fit for ███ he convinced Michelle that cheating was the only way for her to get in.  Michelle agreed, and she will regret it for the rest of her life.

In order to maximize his take, Singer convinced Michelle that she had to engage in *both* the test-cheating *and* the side-door scheme for ███ to be admitted to USC.  In a recorded call placed after ███ was approved by the athletic subcommittee, Singer told Michelle that "if it wasn't for . . . you guys deciding to go the route we did with the [ACT] to get the score we did . . . that was the key that got her over the top." **Ex. 52** (October 5, 2018 call).  He reiterated "your investment in the [ACT] was probably the best investment you made." *Id*.  Still, he emphasized that ███ "can't get a C. She has to have no less than all Bs. . . ." in order to maintain her conditional admission to USC. *Id*.[3]

Michelle knew that she was crossing a line.  She knew that ███ was not a Division-I caliber athlete, and that Singer was falsely claiming she was.  And she knew that Singer was promoting ███ as a beach volleyball player, when in fact her primary focus was indoor volleyball.  She knew that Singer had bribed a proctor to cheat on the ACT and get ███ a score she didn't deserve, and that score was going to be submitted as part of her USC application.  She

---

[3]     Working at the direction of law enforcement, Singer forwarded Michelle a conditional acceptance letter from USC on October 17, 2018.  PSR ¶ 51.  USC formally rescinded that conditional acceptance letter in March 2019.  PSR ¶ 57.  ███ never enrolled at USC. *Id*.

did not know the details of how the scheme would work. She did not know that Singer and his co-conspirators had created a fake athletic profile for ███████ She did not know that any of the money she paid, either to USC directly or to Rick Singer's foundation, would go to any individual administrator or coach. She believed that all the money would go to USC.[4]

When it came time for ████████ Michelle's second daughter, to start the college application process, Michelle had already lost sight of what was right and wrong in connection with ███████ application to USC. Concerned about ██████████████ she wrongly engaged Rick Singer to cheat on her ACT. ███████ false ACT score was never submitted to any university.

Michelle recognizes that these stressors are no excuse for her conduct. Families across the country are stressed out by high stakes testing and don't resort to cheating. When Michelle looks back on some of the things that she said to Rick Singer during that time, she is horrified and embarrassed. Ironically, the students who stood to lose were precisely the same students that Michelle had spent her life trying to encourage and support. After spending so many years trying to level the playing field for disadvantaged students, Michelle tilted it in favor of her children.

The people who know Michelle best are dumbfounded by what she did. **Ex. 27** (Vanessa Thiemann) ("I am stunned and saddened to be writing this letter."); **Ex. 16** (Rob Nelson) ("I honestly cannot believe that Michelle knew or considered the unintended consequences to others . . . ."); **Ex. 34** (Teresa Lopez) ("I was surprised to learn that Michelle got involved in that because

---

[4]    Singer's contact at USC, Donna Heinel, instructed Singer to direct Michelle to send the check to the USC Women's Volleyball gift account. PSR ¶ 54. She told Singer that she was "trying to raise money for Women's Volleyball." **Ex. 53**. (10/31/18 Transcript). Heinel explained that "if [the check] goes into the  USC women's athletic board it goes directly, um, to me." "But . . . if it goes to USC, uh, women's volleyball, it'll go into the volleyball gift account and they're trying to buy, you know, a new floor . . . ." *Id.* Singer asked Heinel "[w]hat would you rather it go under?" *Id.* Heinel replied "Right now we're raising money for the . . . for the, um, floor so if [███████ parents] just did USC women's volleyball gift account and just put in the notes section that its for the floor, that would be great." *Id.* Singer then instructed Michelle to wire $150,000 to the Key Worldwide Foundation, and he assured Michelle that the money would "go directly into our Foundation and then paid to USC." PSR ¶ 52.

she is not of that kind of person, since she was always very legal in everything she did."); **Ex. 33**

(Valentin Lopez) ("When I learned that Michelle was in legal trouble I was devastated because

I've always known Michelle as an upright woman, decent and without prejudice."); **Ex. 39** (Alan

Sellers) ("I have struggled with how could Michelle have done this?  It's so out of character.").

**Ex. 28** (Susan Etchandy) ("It's difficult to reconcile Michelle's involvement in the college

admission scandal and the person I've come to know over the years . . . ."); **Ex. 32** (Melissa Petrus)

("[Michelle's] failure to live up to the standards she has set for herself is a swift departure from

her character and what she represents.").  Even Michelle struggles to make sense of her actions:

> I was the mother who calmed my friends when they panicked about college or their
> children's grades. A few years ago, I gave a copy of *David & Goliath* by Malcom
> Gladwell to the Director of College Counseling at Sage Hill School. I suggested
> that he encourage every parent to read chapter three, which discusses how sending
> a child to an elite school for the sake of the name could be detrimental to their
> child's confidence and future success. An elite school was not the end all, be all. I
> believed this.  I still do.

**Ex. 1** (Michelle Janavs).  "What was I thinking?  How could I abandon my moral compass and act

against everything I believe in and have taught my children?"  *Id*.  "I am beyond embarrassed and

ashamed of my actions.  My decision to act selfishly and unfairly, and to choose wrong over right

was the worst decision I ever made, and one I will never make again."  *Id*.

The most compelling explanation is the one that Michelle's friends and loved ones suggest:

Michelle's anxiety about her own children caused her to lose sight of the impact her actions would

have on others.  *See* **Ex. 40** (Joan Sellers) ("Michelle's actions were purely a result of wanting the

best for her children; and that obscured both her judgment and the 'bigger picture' as it has for

parents historically"); **Ex. 30** (Sofia Ammor) ("The duty to protect one's children could make one

lose sight of what is right from wrong and I know that this is exactly what took place."); **Ex. 28**

(Susan Etchandy) ("Michelle made a terrible mistake driven by her love for her children."); **Ex.**

**19** (Rabbi Arnold Rachlis) ("Michelle's focus on family, charity and selflessness are her defining qualities and I believe that she lost sight of her principles because of blind love for her children.").

## IV.     THE AFTERMATH

The natural consequences of Michelle's conduct have been painful. The first and most immediate one was the early morning raid at Michelle's home on March 12, 2019, when Michelle and her two daughters were handcuffed at gunpoint and led outside of their home by a team of FBI agents.  Her husband notes that the effects of the arrest "still haunt my daughters and Michelle." **Ex. 3** (Paul Janavs).  "Now, any strange sounds or even the slightest earthquake can awaken Michelle and my daughters with heart-stopping fear and panic." *Id*. ████████████████

████████████████████████████████████████████

████████████████████████████████

The fear and grief have not subsided.  **Ex. 35** (Terra Singer) ("I can see daily the pain she carries with her knowing that she has hurt the people that she loves the most."); **Ex. 37** (Laura Choumas) ("We've cried many tears together."); **Ex. 36** (Breana Thomas) ("I can't even count how many times I've had to sit on the floor and hold her while she tries to catch her breath from crying so hard."); **Ex. 43** (Maria Flores) ("I have observed that she has lost weight and she is no longer the cheerful person she has always been.").  "I genuinely believe that the pain and anguish that this incident has caused for Michelle and her family is not anything that any of them will ever forget." **Ex. 42** (Tawny Mazarei).  Michelle will "carry this with her forever." **Ex. 32** (Melissa Petrus).

Michelle's two daughters, who were already reeling from the shock of learning that their mother had betrayed them, were shunned by friends, teachers, and classmates.  Both girls were banned from the campus of their high school, Sage Hill School.  There was no finding by Sage Hill that either of the girls had done anything wrong.  Nonetheless, ████ then a senior, was

banned from campus for the rest of the school year.  **Ex. 54**.  She was not allowed to attend any classes or participate in any school events, including prom or graduation.  *Id*.  ████ who was then a junior, was also banned from campus and excluded from school events.  **Ex. 55**.   Both girls were encouraged by Sage Hill to "seek mental health support and/or counseling."  *Id*.

USC rescinded ████ conditional acceptance and she was barred from ever applying again.  **Ex. 56** (March 15, 2019 letter).  She withdrew all of her other applications as well and ultimately enrolled in a community college.  ████ enrolled in a local public school.  PSR ¶ 111.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ .  ████ had studied hard to get a competitive score on the ACT the first time, not knowing that Michelle had rigged it in her favor.  Now ████ had to start the process over and take the test again.  When ████ applied for four-year colleges last fall, she had to disclose what Michelle had done and explain it to admissions officers.

V.    **JUST PUNISHMENT**

A.    **The Sentencing Guidelines**

Michelle concurs with the finding of the Probation Office that the applicable guideline is U.S.S.G. § 2S1.1, the total offense level is 6, and her criminal history category is I.  PSR ¶¶ 90,

95.[56]  The guideline imprisonment range is zero to six months.  PSR ¶ 136.[7]  Because the

guideline range falls within Zone A, a sentence of imprisonment is not required.  *Id.*

### B.       The 3553(a) Factors

The factors set forth in 18 U.S.C. § 3553(a) only reinforce that conclusion.  The nature

and circumstances of the offense are that Michelle, like dozens of parents, took the opportunity

to give her children an illegal edge in the college admissions process.  When viewed in light of

Michelle's history and characteristics, her conduct stands in stark contrast to her life's work.

---

[5] The government argues that the total offense level for Count Two should be 7.  Dkt. No. 816 (Consolidated Sentencing Memo) at 15.  This Court overruled an identical objection when it sentenced Doug Hodge, 19-CR-10080-NMG-11, Dkt. No. 840.  Because the "offense of conviction" for Count Two (18 U.S.C. § 1956(h)), is not "referenced to" in the appendix for § 2B1.1, the appropriate base offense level is 6.  *See* U.S.S.G. § 2B1.1(a)(2).

[6] The government also argues in a footnote that the Court should apply U.S.S.G. § 2B4.1, rather than § 2B1.1, for Count One.  Dkt. No. 816 at 14, n. 10.  This Court rejected the same argument when it sentenced Toby McFarlane, 19-CR-10131-NMG, and Doug Hodge, 19-CR-10080-NMG-11, and it should do the same here.  Every other court in this district has also reached the same conclusion.  *See United States v. Vandermoer*, 19-CR-10079-RWZ; *United States v. Abbott, et al.*, 19-CR-10117-IT; *United Sattes v. Bizzack*, 19-CR-10222-DPW.

[7] The government argues for an arbitrary upward departure on the ground that the offense involves an "aggravating, non-monetary objective."  Dkt. No. 816 at 18, citing Application Note 21(A) to U.S.S.G. § 2B1.1.  But upward departures are appropriate only where there is an aggravated circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."  U.S.S.G. § 5K2.0(a).  All the factors the government cites in support of a departure were considered by the Sentencing Commission.  For example, the government argues that Michelle "repeatedly engaged in serious criminal conduct over the course of an extended period."  Dkt. No. 816 at 18.  But the number of acts Michelle committed, the length of time of that course of conduct, and the seriousness of it, have already been factored into the guidelines.  *See* U.S.S.G. § 2B1.1 (b); § 1B1.3(a)(2).  To use the same facts to support an upward departure would double-count them in the analysis and result in an arbitrary sentence. Some of the government's arguments are explicitly prohibited as a ground for an upward departure. For example, the government argues that Michelle should be punished because she "waited to accept responsibility . . . until months after [she] was indicted . . . ."  Dkt. No. 816 at 2.  But Michelle fully accepted responsibility well before trial and is therefore entitled to a two-point reduction under U.S.S.G. § 3E1.1.  The guidelines make clear that acceptance of responsibility "may be taken into account only under § 3E1.1."  U.S.S.G. § 5K2.0(d)(3).

Michelle has spent decades working to level the playing field for disadvantaged kids. The Court should consider not only the harm she has caused, but also the tremendous good she has done.

A sentence of incarceration is not necessary to punish Michelle or promote respect for the law. The past year has shaken Michelle to her core and caused her to reflect on the terrible decisions she made. She has taken full and complete responsibility for her conduct. She understands the harm that she has caused and will spend the rest of her life trying to make amends. It is not necessary for specific deterrence. No one suggests that Michelle would engage in similar conduct in the future. And it is not necessary for general deterrence. Michelle's path from well-respected mother and philanthropist to scorned felon is on display for everyone to see. Her conduct has brought public shame on her and her family and harmed, rather than helped, her children. The fallout from Michelle's actions stand as a beacon to others that illegal shortcuts are a recipe for disaster, regardless of the punishment the court imposes on Michelle.

Finally, Michelle plays a vital and necessary role as a caretaker to both her mother, Lilly, ██████████████████████████████, and to her daughter, ██████████████████████ ████████████████. If Michelle were sentenced to a term of imprisonment it would "cause a substantial, direct, and specific loss of essential caretaking" to her family. *See* U.S.S.G. § 5H1.6, Cmt. N. 1(B)(i). The loss is not financial, nor is it the kind of loss ordinarily associated with the incarceration of a parent. *See* Cmt. n. 1(B)(ii). As the letters submitted to this Court by Dr. Lerman, Stephanie Laut, Paul Janavs and Paul Merage make clear, Michelle's role as a caretaker for both Lilly and ████ cannot be replaced by anyone else. *See* Cmt. n. 1(B)(iii).

### C.    The Need to Avoid Unwarranted Sentencing Disparities

Applying the government's own metrics, Michelle is less culpable than any of the defendants due to appear before this Court. Whereas Doug Hodge attempted to engage in the side-door scheme on behalf of five children, and succeeded with four of them, Michelle attempted the

side door for only one child.  Taking into account test cheating, Michelle engaged in the admissions scheme fewer times (3) than either Hodge (5) or the Henriquezes (6).  And two of the three instances related to the same child.  The duration of Michelle's participation in the offense was shorter too.  Whereas Hodge engaged in the scheme over a period of nearly 11 years, Michelle's participation in the scheme lasted about 18 months.  And unlike most of Michelle's co-defendants who went on to actually enroll their children in colleges under false pretenses, neither of Michelle's daughters ever enrolled in any college as a result of the scheme.

If the amount of bribe payments are an accurate proxy for culpability, Michelle is also the least culpable in the group.  Whereas Michelle agreed to pay $300,000 (and in fact paid $150,000), Hodge paid $850,000 and the Henriquezes paid $530,000.  Dkt. No. 816 at 19.  Toby McFarlane, who this Court sentenced to six months, agreed to pay $450,000.  Dkt. No. 334.

Michelle was also less proactive in her participation in the offense.  Whereas Hodge actively participated in the creation of a false athletic profile for his son, *see* Dkt. No. 816 at 21, and communicated directly with Donna Heinel and other insiders, Michelle didn't know anything about the fake athletic profile created for her daughter, and she never spoke to Donna Heinel or anyone else at USC about the process.  And whereas many parents submitted photographs of their children falsely posing as athletes in sports they never played, Michelle submitted pictures of her daughter playing volleyball, a sport that she *actually* played competitively for her high school. The fact that Michelle was further removed from the scheme is significant because it suggests that Singer did not trust that she would go through with the plan if she knew more about it.  Finally, unlike many parents who knowingly paid bribe money to individual coaches, Michelle believed that all the money she agreed to pay as part of the side door scheme would actually go to USC.

The government argues that Michelle, along with Hodge and Manuel Henriquez, should be punished because she occupied a "position of trust" as a member of the Board of Trustees for

her children's high school.  Dkt. No. 816 at 23.  But Michelle's position as a volunteer for her children's school cannot be compared to Hodge's role as "chief executive of one of the world's largest asset management firms" or Henriquez' role as "chief executive of a publicly traded company."  *Id*.  Even assuming Michelle's position on a high school board of trustees constituted a "position of trust," the government does not contend that it had anything to do with the offense.[8]

## VI.    CONCLUSION

Michelle's life has been defined by kindness, generosity, and selflessness, particularly toward those less fortunate than her, and particularly toward disadvantaged children.  Her profound moral lapse in this case was driven by her overwhelming love for her children and her desire to protect them from the anxiety of the college admissions process.  Love is not an excuse for Michelle's poor choices.  But Michelle has already suffered profoundly because of what she did.

18 U.S.C. § 3553(a) begins with the requirement that the sentence must be "sufficient, but *not greater than necessary*," to comply with the purposes in the sentencing statute.  18 U.S.C. § 3553(a)(1) (emphasis added).  Known as the "parsimony principle," this "broad command" serves as an upper limit on what punishment can be imposed.  *See Dean v. United States*, 137 S.Ct. 1170, 1175 (2017).  The government has conceded that a substantial prison term is not necessary in this case.  Dkt. No. 423 at 4.  ("[T]he public interest does not require substantial prison terms for these parents.").  It has not articulated *any rational basis* for its recommendation of a 21-month sentence. Nor has it articulated why a term of probation would not accomplish the same purpose.

---

[8] The sentencing guidelines call for a sentencing enhancement for "abuse of a position of trust" only where "the position of public or private trust . . . contributed in some significant way to facilitating the commission or concealment of the offense . . ."  U.S.S.G. § 3B1.3, Cmt. n. 1.

Respectfully Submitted,

MICHELLE JANAVS

By her attorneys,

Dated:  February 20, 2020        */s/ John L. Littrell*

Thomas H. Bienert, Jr. *(pro hac vice)*
John Littrell *(pro hac vice)*
Bienert | Katzman PC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Tel: (949) 369-3700
tbienert@bienertkatzman.com
jlittrell@bienertkatzman.com

William Weinreb (BBO #557826)
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (617) 712-7114
billweinreb@quinnemanuel.com

Jonathan L. Kotlier (BBO #545491)
Nutter, McClennen & Fish, LLP
155 Seaport Boulevard
Boston, MA 02210-2604
Tel: 617-439-2000
jkotlier@nutter.com

**CERTIFICATE OF SERVICE**

I, John Littrell, hereby certify that on February 20, 2020, this document, filed through the

CM/ECF system, will be sent electronically to all registered participants in this matter as identified

on the Notice of Electronic Filing (NEF).


*/s/ John L. Littrell*
John L. Littrell