# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v. ) | Case No. 1:19-CR-10080-NMG |
| ) | |
| ) | |
| DAVID SIDOO, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MICHELLE JANAVS' MOTION TO MODIFY SENTENCE

Leave to file granted on April 21, 2020 [Dkt. 1095]

## I.     INTRODUCTION

Michelle Janavs is a non-violent first offender who poses no risk of danger to the public and very little risk of reoffending.  Her advisory guideline sentencing range is zero to six months. When this Court sentenced Ms. Janavs to five months' imprisonment, at the high end of that range, it did so in order to punish her and to send a message to others.

The Court accomplished that goal.  All the major news networks covered Ms. Janavs' sentencing.  Sincerely remorseful and ashamed of her actions, Ms. Janavs accepted the punishment that the Court imposed on her.  She arranged to immediately surrender to the Bureau of Prisons ("BOP") because she wanted to put this behind her and focus on making amends for her crime. She does not intend to pursue an appeal or post-conviction relief.  But given Ms. Janavs' underlying health condition and the deadly COVID-19 pandemic that is spreading throughout the BOP, serving a carceral sentence would pose a serious risk to Ms. Janavs' health, as well as to other BOP inmates, BOP staff, and their families.

COVID-19, a deadly and highly contagious virus, has spread rapidly across the globe.  As of April 21, 2020, the United States has more confirmed cases and more deaths from the virus than any country in the world.[1]  It has spread quickly throughout the U.S. population.  On March 1, 2020, there were 89 confirmed cases; six weeks later, the U.S. had over 500,000 confirmed cases, and today there are 826,184 confirmed cases.[2]  Since the pandemic began, at least 45,150 people have died from COVID-19 in the United States.[3]

---

[1] Johns Hopkins University of Medicine, Coronavirus COVID-19 Global Cases, Center for Systems Science and Engineering, last visited April 22, 2020, available at https://coronavirus.jhu.edu/map.html (updated daily) (hereafter, "COVID-19 Global Cases Tracker").

[2] *See Id.*

[3] *See Id.*

As grim as these figures appear, they pale in comparison to the infection and death rates in the BOP.  On March 20, 2020 the BOP reported just two COVID-19-positive inmates and staff. Today there are over 1,000 reported cases.[4]  At least 23 BOP prisoners have died from COVID-19.[5]  There is no vaccine or treatment.  The only way to prevent infection is to engage in aggressive "social distancing:" avoiding all unnecessary personal interaction or group settings, maintaining extreme levels of personal hygiene such as frequent hand-washing, and wearing gloves and a face-covering while near others.[6]  None of these precautions is possible in BOP custody.

REDACTED

[4] Federal Bureau of Prison, COVID-19 Cases, available at
https://www.bop.gov/coronavirus/index.jsp (updated daily) (hereafter, "BOP COVID-19 Cases").
[5] *Id.*
[6] CDC, How to Protect Yourself and Others, (last visited April 22, 2020), available at
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (hereafter, "How to Protect Yourself and Others").
[7] *See infra* at Section III(B).

In sum, if Ms. Janavs were to surrender to BOP custody, she is highly likely to become infected with COVID-19.  And because of her underlying health condition, she faces a much higher risk than others of serious complications, hospitalization, or death from the virus.

By contrast, home incarceration in lieu of BOP custody for the same period would impose sufficient punishment without the corresponding risk of disease and death.  The United States Attorney General has already instructed BOP to consider transferring vulnerable, non-violent offenders like Ms. Janavs to home confinement.[8]  However, there is no guarantee that BOP will transfer Ms. Janavs in a timely fashion (or at all).  And even if it does, BOP's process of transferring vulnerable inmates to home confinement has been arbitrary and unpredictable, and it has created unnecessary risk and hardship for both prisoners and BOP staff.

Taking into account the seriousness of the offense and the need for just punishment, 18 U.S.C. § 3553(a)(2)(A), the need to protect the public, 18 U.S.C. § 3553(a)(2)(C), and the need to provide necessary medical care, 18 U.S.C. § 3553(a)(2)(D), Ms. Janavs respectfully moves pursuant to 18 U.S.C. § 3582(c) to modify her sentence to a five-month term of home confinement.

The government has authorized us to represent that it opposes this motion on both substantive and procedural grounds, including that the defendant has not properly exhausted her remedies under 18 U.S.C. § 3582 (c)(1)(A), but does not object to a 60-day continuance of Ms. Janavs' surrender date.

## II.    PROCEDURAL BACKGROUND

On October 21, 2019, Michelle Janavs pleaded guilty "straight up" to the indictment.  There was no agreement from the government to dismiss any of the charges or recommend a favorable sentence.  Ms. Janavs accepted responsibility for her crimes, stating (among other things):  "There

---

[8] Office of the Attorney General, Memorandum for Director of Bureau of Prisons, April 3, 2020, available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

3

are truly no words to express my heartache and shame caused by my actions." Dkt. No. 872 (February 25, 2020 Transcript) at 53. At sentencing, the government argued that a prison term was necessary for general deterrence. *Id*. at 17. When this Court sentenced Ms. Janavs to five months' imprisonment, near the high end of the guideline range, it also emphasized the need for general deterrence, stating "[y]our sentence needs not only to deter you from ever doing anything like this again but also to deter anyone else who has the gall to use his or her wealth to disparage our expectation for honest services from our public and private officials." *Id*. at 54. The Court's words and the sentence itself were widely publicized by media outlets across the country.[9]

On March 2, 2020, Ms. Janavs' counsel contacted the Court's deputy clerk to request that the Court expedite the Judgment and Commitment ("J&C"), because Ms. Janavs wanted to surrender as quickly as possible. **Ex. 1** (Declaration of John Littrell) at ¶ 2. Ms. Janavs was designated by the BOP to serve her sentence at the Federal Prison Camp in Bryan, Texas. *Id* at ¶ 3. Ms. Janavs was prepared to serve her custody term as ordered by the Court and planned to do so. She wanted to pay her debt to society and put this behind her. *Id* at ¶ 4.

Shortly after Ms. Janavs' sentencing, the government produced exculpatory evidence that it has since acknowledged should have been produced to the defendants (including Ms. Janavs) long before Ms. Janavs pleaded guilty. *See* Dkt. No. 918. This Court continued Ms. Janavs' surrender

---

[9] *See, e.g.,* Barnini Chakraborty, *Hot Pockets Heiress Sentenced to 5 Months in Prison in College Admissions Scandal*, Fox News, Feb. 25, 2020, available at https://www.foxnews.com/us/hot-pockets-heiress-michelle-janavs-sentenced-college-admissions-scandal; David K. Li, *Hot Pockets Heiress Sentenced to 5 Months in Prison for Role in College Admissions Scandal*, NBC News, Feb. 25, 2020, available at https://www.nbcnews.com/news/us-news/hot-pockets-heiress-sentenced-5-months-prison-role-college-admissions-n1142776; Matthew Ormseth, *College Admissions Scandal: Heir to Hot Pockets Fortune Sentenced to 5 Months*, L.A. Times, Feb. 25, 2020, available at https://www.latimes.com/california/story/2020-02-25/college-admissions-scandal-michelle-janavs-hot-pockets-sentenced; Travis Andersen, *Hot Pocket Heiress Headed to Prison in College Admissions Scandal*, Boston Globe, Feb. 25, 2020, available at https://www.bostonglobe.com/2020/02/25/metro/what-was-i-thinking-hot-pockets-heiress-faces-sentencing-college-admissions-cheating-scandal/.

date to May 7, 2020 to give her and her counsel time to review that evidence and determine whether to pursue an appeal or post-conviction relief.  Dkt. No. 946.   Ms. Janavs has reviewed the evidence and has decided that the delay and uncertainty surrounding an appeal or petition for post-conviction relief would only prolong her punishment.  She does not intend to pursue relief and has let the time within which to file a notice of appeal lapse.  She accepts the five-month sentence the Court imposed and wishes to begin serving it now, but the conditions within the BOP make it unsafe to do so.

## III.     FACTUAL BACKGROUND[10]

### A.     COVID-19 is a Deadly and Rapidly Spreading Disease

Since Ms. Janavs was sentenced, the COVID-19 pandemic has spread throughout the world and the President of the United States has declared a national emergency.  As of April 21, 2020, the United States had 826,184 confirmed cases, the most of any country in the world.[11]

COVID-19 attacks the respiratory system and replicates quickly there.[12]   When the infection stays in the upper respiratory system it causes fever, congestion, and a dry cough.  In a significant number of patients, the infection spreads to the lungs.  When COVID-19 spreads to the lungs it also causes shortness of breath, chest pain, and severe inflammation.  This inflammation constricts the flow of oxygen and can further weaken the lungs.  The result is pneumonia, which is the most common cause of death in people infected with COVID-19.[13]

More people have died from COVID-19 in the U.S. than in any other country in the world.  As of April 21, 2020, 45,150 people have died in the United States alone, and those numbers are increasing by the thousands each day.[14]  On April 16, 2020, over 4,591 people died in a span of

---

[10] If the government contests any of these facts, Ms. Janavs requests an evidentiary hearing.
[11] John Hopkins, COVID-19 Global Cases Tracker (last visited April 22, 2020).
[12] *Id.*
[13] *Id.*
[14] *Id.*

twenty-four hours.[15]  That death rate was nearly double the previous daily record of 2,569 deaths, which was set the day before.[16]  Projections for the impact of the virus are grim—on March 31, 2020, President Donald Trump and the White House COVID-19 Task Force announced that it expected 100,000 to 240,000 people to die in the United States over the next couple of months.[17]

**B.      Ms. Janavs Faces an Acute Risk of Serious Illness or Death from COVID-19**

REDACTED

---

---

[15] Jennifer Calfas et al., *Reported U.S. Coronavirus Deaths Reach Record 4,591 in 24 Hours,* Wall Street Journal, April 17, 2020, available at https://www.wsj.com/articles/coronavirus-surges-in-some-asian-countries-that-had-been-lightly-hit-11587031743?mod=rsswn.
[16] *Id*.
[17] Rick Noack, *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even with Mitigation Efforts*, The Washington Post, March 31, 2020, available at https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/.

REDACTED

### C.      Prison is an Ideal Environment for the Transmission of COVID-19

Because of how quickly and easily COVID-19 can spread, the CDC recommends that people engage in a number of preventative measures, including frequent handwashing and sanitizing using alcohol-based hand sanitizers, cleaning and disinfecting frequently touched surfaces (including tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks), and wearing a cloth face covering whenever they must

---

[18] CDC, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, March 31, 2020, available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.
[19] *Id.*

venture out in public.[20]  Most important, the CDC recommends that people "stay at home as much as possible" and "put distance between [themselves] and other people."[21]

None of these preventative measures is possible in prison.  People in custody are in near constant physical contact with other inmates and prison staff.  Showers are rarely private, multiple people share tiny and cramped living spaces, including exposed toilets and wash areas.  Public health officials are unanimous: incarcerated individuals are particularly vulnerable, and "realistically, the best — perhaps the only — way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible."[22]

### D.    The BOP's COVID-19 Response Plan is Outdated and Ineffective

The BOP's plan to mitigate the spread of COVID-19 is to suspend social and legal visiting, limit transfers of inmates, and screen inmates (and in some cases, staff) entering the facility.[23]

Notwithstanding these plans, inmate transportation continues.  BOP reports that "all inmates are being authorized for movements from all facilities" so long as (1) they have been in BOP custody for greater than 14 days, and (2) the BOP performs an "exit screening" that confirms that they do not have active symptoms or a temperature above 100.4 degrees.[24]

---

[20] *See* CDC, *How to Protect Yourself and Others.*

[21] *Id.*

[22] *See e.g.,* Jan Ransom et al., *"A Storm is Coming": Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, N.Y. Times, Mar. 20, 2020, available at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html; Jean Casella & Katie Rose Quandt, *US Jails Will Become Death Traps in the Coronavirus Pandemic*, The Guardian, Mar. 30, 2020,  available at https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island ("From a public health and public safety standpoint, the solution to this crisis is quite simple: let them go.").

[23] *See* Federal Bureau of Prisons, BOP Implementing Modified Operations, available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited April 22, 2020) (hereafter, "BOP Modified Operations Plan").

[24] *Id.*

BOP's method of screening inmates for COVID-19 appears to be based on outdated assumptions about who carries the disease and how it is spread.  According to the BOP's updated COVID-19 Modified Operations Plan, all incoming inmates are screened for "exposure risk factors" and symptoms.[25]   But only those incoming inmates with *both* "exposure risk factors" *and* symptoms are tested for COVID-19.[26]   Inmates with "exposure risk factors" but no reported symptoms are temporarily isolated, but they are not tested.  Inmates with symptoms alone are ***neither isolated nor tested***.  The BOP's COVID-19 Modified Operations Plan does not define what "exposure risk factors" are.   The BOP's Inmate Screening questionnaire suggests that those "risk factors" are limited to self-reported recent travel by the inmate (within the last 14 days) to various countries identified by the CDC as posing an increased risk of infection, or close contact with someone "diagnosed with" COVID-19 within the last 14 days.  *See* **Ex. 3** (BOP COVID-19 Inmate Screening Tool).   But a significant number of people carrying (and infecting others with) COVID-19 are asymptomatic.  The CDC has concluded that as many as 25% of people infected with COVID-19 may not show symptoms.[27]  The true figure may be much higher:  in response to a COVID-19 outbreak on a U.S. aircraft carrier, the Navy recently tested nearly all 4,800 crew members; roughly 60% of the sailors who tested positive showed no symptoms.[28]

The process for screening staff appears to be similarly flawed.  The BOP's website suggests that only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subjected to "[e]nhanced screening."[29]   And this "enhanced screening" appears

---

[25] *Id.*

[26] *Id.*

[27] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, N.Y. Times*, April 20, 2020, available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[28] Paul Stewart et al., *Coronavirus Clue? Most Cases Abroad U.S. Aircraft are Symptom-Free*, Reuters, April 16, 2020, available at https://www.reuters.com/article/us-health-coronavirus-usa-military-sympt-idUSKCN21Y2GB.

[29] Federal Bureau of Prisons, BOP Modified Operations Plan.

to consist of temperature checks and self-reporting—it does not require staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people. There is no indication of how "enhanced" screening for BOP staff compares to "ordinary" screening, or if there is any sort of "ordinary" screening for staff at all. Because BOP staff come and go between their homes and BOP facilities regularly, they are a primary conduit for the disease.

### E. The Number of COVID-19 Cases in the BOP is Rising Exponentially

Not surprisingly, the BOP is experiencing a massive COVID-19 outbreak. On March 2, 2020, the BOP was reporting only two confirmed cases of COVID-19. As of April 21, 2020, there were at least 540 BOP inmates and 323 BOP staff with confirmed cases of COVID-19.[30] That is an increase of over 43,000 percent, far higher than the rate of transmission in the community.[31]



---

[30] Federal Bureau of Prisons, BOP COVID-19 Cases (last visited April 22, 2020).
[31] *Id.*

These numbers are almost certainly an undercount. Because only those inmates who have symptoms *and* "exposure risk factors" are tested for COVID-19, the actual infection rates are likely much higher. The disease is likely to spread even more quickly at this point because of the uniquely conducive conditions at BOP facilities. New inmates are brought into the system regularly, and inmates continue to be transferred to and from other facilities. BOP staff return to their homes each night and report for work the next day, with each day representing another opportunity to both become infected with the virus and spread it to inmates in their custody.

BOP staff have reported dangerous and unhygienic conditions across the country.[32] The New York Times "spoke[] with more than a dozen workers in the Bureau of Prisons," who reported that "federal prisons are ill-prepared for a coronavirus outbreak.[33] Many lack basic supplies like masks, hand sanitizer, and soap."[34] A BOP employee in Atlanta explained that staff does not have enough gloves, masks, or other supplies to respond to this outbreak. Nor do they "have enough space to properly quarantine inmates."[35] One Texas federal prison worker told the New York Times, "We don't have the ventilators on hand at all. We are not a hospital. We don't have the medical staff."[36] Staff at FCI Tallahassee, a low-security facility, confirmed that BOP is "just not prepared to handle something of that nature."[37] On March 31, 2020, BOP employees filed a

---

[32] *See, e.g.*, Mitch Smith, et al., *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, Mar. 29, 2020, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html ("Coronavirus in the U.S."); Joseph Darius Jafari, *Federal Government Said It Halted Prison Transfers. They're still Happening*, PA Post, March 23, 2020, available at https://papost.org/2020/03/23/federal-government-said-it-halted-prison-transfers-theyre-still-happening/.

[33] Smith, *Coronavirus in the U.S.*

[34] *Id.*

[35] *Id.*

[36] Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N. Y. Times, March 17, 2020, available at https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[37] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Test: How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice News, March 24, 2020, available at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-

complaint with the United States Department of Labor, Occupational Safety and Health Administration ("OSHA") alleging that the BOP's policies were "proliferating the spread of a known and deadly contagion" and that the agency's "actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities." **Ex. 4**.

In a recent memorandum, Attorney General William Barr acknowledged the obvious: "Each time a new person is added to a jail, it presents at least some risk [of infection] to the personnel who operate that facility and to the people incarcerated therein.  It also presents risk to the individual being remanded into custody – risk that is particularly acute for individuals who are vulnerable to a serious infection under the [CDC] Guidelines." **Ex. 5**.

## IV.    LEGAL STANDARD

 A court may grant a sentence reduction either upon motion of the Director of the BOP, or upon motion of the defendant after "the lapse of 30 days from receipt of such a request [from the defendant] by the warden of the defendant's facility, whichever is earlier. . . ." 18 U.S.C. § 3582(c)(1)(A).  In order to modify a sentence, a district court must engage in a three-step process.

First, the court must consider the 18 U.S.C. § 3553(a) factors.  18 U.S.C. § 3582(c)(1)(A).

Second, the court must find that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission has determined that "extraordinary and compelling reasons" include (1) medical conditions which diminish the ability of the defendant to provide self-care in prison, (2) age-related deterioration, (3) family circumstances, and (4) other extraordinary and compelling reasons that exist either separately or in combination with the previously described categories.  USSG § 1B1.13.

---

is-failing-federal-inmates-as-coronavirus-hits.

Third, the Court must find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  18 U.S.C. § 3582(c)(1)(A).

## V.     THE COURT SHOULD MODIFY MS. JANAVS' SENTENCE PURSUANT TO § 3582(c)

### A.   Ms. Janavs has Fulfilled § 3582(c)'s Exhaustion Requirement

Ms. Janavs has exhausted her administrative remedies.  On March 23, 2020, counsel for Ms. Janavs sent a letter to Warden Steve Mora of FPC Bryan, where Ms. Janavs has been designated, asking the BOP to convert her five-month prison sentence to home confinement because of the COVID-19 pandemic.  **Ex. 1** (Declaration of John Littrell) at ¶ 5.  On April 1, 2020, counsel spoke with Jason Sickler, Regional Counsel for the Bureau of Prisons, to follow up on the request.  *Id*. at ¶ 6.  Mr. Sickler stated that the BOP had received the request, but that because Ms. Janavs is not yet in custody, the BOP would not move for a sentencing modification on her behalf. *Id*. Thirty days have passed since Ms. Janavs' letter to the Warden requesting a motion for a sentencing modification, and there has been no further response from BOP.

Ms. Janavs has therefore exhausted her administrative remedies. She has done so by (1) petitioning the BOP; (2) following up on the request; and (3) being told that the BOP cannot grant her any relief because she is not yet in custody.  *See United States v. Macfarlane, No. CR 19-10131-NMG, 2020 WL 1866311, at *1 (D. Mass. Apr. 14, 2020)* ("Defendant Macfarlane has requested that the BOP file a motion to reduce his sentence and the BOP has denied that request. The Court finds that defendant has therefore fully exhausted his administrative rights and his motion is properly before this Court."); *see also United States v. Gonzalez*, CR 18-0232-TOR, Dkt. No. 834 (E.D.WA. Mar. 31, 2020) (Defendant exhausted administrative remedies by petitioning the BOP, giving them notice, and being told she does not have any remedies she can pursue.).

Alternatively, Ms. Janavs has exhausted her administrative remedies within BOP because thirty days have lapsed since her request to the warden. *See* 18 U.S.C. § 3582(c)(1)(A).

Any attempt to further exhaust administrative remedies would be futile because the BOP has already made clear that it will not grant Ms. Janavs request because she is not in BOP custody. *See United States. v. Powell*, CR 94-00316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020); *United States v. Perez*, CR 17-00513-AT, Dkt. No. 98 (SDNY Apr. 1, 2020).

### B.    The 3553(a) Factors Favor Reducing the Sentence to Home Confinement

Ms. Janavs is a 49-year-old non-violent first-time offender. Dkt. No. 872 at 53. Congress has recognized the "general appropriateness" of permitting a defendant to serve "a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Ms. Janavs is also a mother of three and a philanthropist who has dedicated decades of her life to helping others, particularly vulnerable children. The Court recognized Ms. Janavs' heart-felt remorse and her "many deeds of charity and kindness" and found that those and other unique circumstances warranted a "reduction in what otherwise would be a warranted sentence." *Id.*

Though the Court imposed a five-month prison term, it found that the advisory sentencing range was zero to six months and fell within Zone A of the sentencing table. The Sentencing Commission has indicated that "[i]f the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment . . . ." U.S.S.G. § 5C1.1, Cmt. n. 4 (2018).

The Court's sentence was driven by the need to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and the need to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A), (B). There was no discussion of the need to "provide the defendant with needed . . . medical care . . . ," 18 U.S.C. § 3553(a)(2)(D), or to protect BOP staff and inmates from additional risk of infection, because the COVID pandemic had not yet begun in the United States. If Ms. Janavs were sentenced today, the

Court would naturally consider Ms. Janavs' heightened risk of infection if incarcerated, increased likelihood of suffering serious illness or death if infected because of her underlying medical condition, and the additional risk to BOP staff, their families and communities, and other inmates from placing yet another individual in prison at a time when BOP has been directed to reduce the prison population. Those factors would strongly support a sentence of five months' home confinement, where enforced social isolation would help safeguard everyone's health.

If Ms. Janavs were to surrender to a BOP facility for her sentence now, she (like any inmate surrendering to BOP under the current circumstances) would pose a risk to staff and inmates. She could introduce the virus into the facility, and that virus could infect others, including inmates and staff, who may also have underlying health conditions. Moreover, if Ms. Janavs were to become infected with COVID-19, there is a high likelihood that she would have to be hospitalized to prevent the rapid deterioration seen in other REDACTED COVID-19 patients. The resources needed to save Ms. Janavs' life could be, and should be, used for someone else.

### C.     Ms. Janavs Poses No Danger to Anyone

It is undisputed that Ms. Janavs poses no danger to any other person or the community.

### D.     Extraordinary Circumstances Warrant Home Confinement

This Court has already held that the COVID-19 pandemic is an extraordinary and compelling circumstance warranting release to home confinement. See *Macfarlane*, 2020 WL 1866311, at *1. It did so in a case where the defendant was not even health compromised. The Court reasoned that release was warranted in light of the COVID-19 pandemic and national emergency, the particular risk of infection and transmission risk in penitentiary facilities, the fact that the defendant was a non-violent first offender who posed no danger to the community, and the fact that he was subject to quarantine in solitary confinement in a higher-security facility.

That logic applies with even greater force here because Ms. Janavs has a health condition rendering her particularly vulnerable. *See United States v. Huneeus*, No. CR 19-10117, Dkt. No. 642 (D. Mass. Mar. 17, 2020) (finding that extraordinary and compelling circumstances warranted sentence modification and ordering defendant released to home confinement "in light of the national state of emergency due to the global COVID-19 pandemic and Huneeus' unique health circumstances . . . ."); *see also United States v. Sloane*, No. CR 19-10117-IT, Dkt. No. 647 (finding that release "may well be warranted in light of the pandemic due to COVID-19, the national emergency as declared by the President of the United States, the risk of infection and transmission for inmates and staff posed by the population density of prisons, and the fact that Defendant is a first time offender who does not pose a danger to the safety of another person or the community," but denying motion because of unexplained failure to exhaust administrative remedies).

Other courts in this district have reversed previous detention orders as a result of the COVID-19 pandemic and the concomitant risk to detainees. *See, e.g., United States v. Juan Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) (ordering pre-trial release for a defendant who had previously been found to be a risk of flight and danger to the community because defendant was diabetic and asthmatic and therefore at high risk for contracting COVID-19); *Maria Savino v. Steven J. Souza,* --- F. Supp. 3d ---, No. CV 20-10617-WGY, 2020 WL 1703844, at *8 (D. Mass. Apr. 8, 2020) (granting bail for habeas petitioners in ICE custody to prevent risk of COVID-19 infection after finding that "[e]ven the young and otherwise healthy detainees face a 'substantial risk'" of serious harm from COVID-19).

Indeed, if Ms. Janavs were in custody now, it is likely that she would be processed for release to home confinement. On March 26, 2020, the Attorney General directed the BOP to use its authority to "prioritize" the transfer of eligible prisoners to home confinement in order to prevent the spread of COVID-19. **Ex. 6** (March 26, 2020 Memorandum). The Attorney General

noted that "in assessing which inmates should be granted home confinement" the BOP should consider a number of factors, including (1) the age and vulnerability of the inmate to COVID-19, in accordance with the [CDC] guidelines, (2) the security level of the facility currently holding the inmate, (3) the inmate's PATTERN score, (4) the existence of a verifiable reentry plan, and (5) the inmate's crime of conviction and assessment of the danger posed by the inmate to the community.  All the criteria set forth in that memo would favor Ms. Janavs' release. Eight days later, the Attorney General expanded that directive in response to "significant levels of infection at several [BOP] facilities." **Ex. 7** (April 3, 2020 Memorandum).  He acknowledged that the BOP's precautions "have not been perfectly successful" at all BOP institutions and directed BOP staff to "move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions." *Id*.  The Attorney General directed that "all at-risk inmates – not only those who were previously eligible for transfer" should be processed for release. *Id*.

But the process of releasing current prisoners to home confinement has proved to be a logistical nightmare for the BOP and a harrowing ordeal for prisoners.  As this Court saw in the case of Mr. Macfarlane, the BOP required him to undergo a 14-day locked-down quarantine prior to being released. *Macfarlane*, 2020 WL 1866311, at *1.  Because the camp where he was housed had no quarantine facility, he was transferred to a higher-security facility where he was confined to a cell for 23 hours a day and was not able to contact his family.  *Id*.  This Court found that Macfarlane's two-week confinement in solitary quarantine was the "equivalent of two months in the Camp to which he was originally assigned."  *Id*.  It would serve no purpose to require Ms. Janavs to surrender to the custody of the BOP when the BOP is scrambling to process defendants like her for transfer out of custody, and into home confinement.  The process of surrendering to a remote BOP facility, seeking early release, and then being transferred to another facility where she

might have to spend 14-days in solitary confinement would create unnecessary risk and hardship for Ms. Janavs, other inmates, and BOP staff, their families, and communities.

Nor would a temporary delay in Ms. Janavs' surrender date solve the problem.  Public health experts warn that the U.S. will likely be hit by a second wave of COVID-19 cases.[38]  Dr. Robert Redfield, CDC director and virologist, has stated that the CDC is preparing "most likely, for another wave that we would anticipate in the late fall, early winter where there will still be a substantial portion of Americans that are susceptible."[39]  Even without a second wave the virus will persist as a threat to public health until a vaccine is made available to the public, which could take 12-18 months.[40]  A recent study by Harvard University's T.H. Chan School of Public Health warned that social distancing may be necessary into 2022.[41]  And even if the U.S. is able to "flatten the curve" in the general population, there is no sign of flattening in the BOP.

Moreover, a delay of the surrender date would cause a hardship for Ms. Janavs.  She pled guilty straight up and chose not to pursue an appeal or post-conviction relief because she wanted to pay her debt to society and put this behind her.  Delaying her surrender date not only prolongs the anxiety and anticipation of serving time, it also delays the date she finishes her term.

---

[38] *See* Sam Whitehead, *CDC Director on Models for the Months to Come: "This Virus Is Going to be with Us",* NPR, March 31, 2020, available at https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us.

[39] *Id*.

[40] *See* Noah Higgins-Dunn, *White House advisor Fauci says coronavirus vaccine trial is on target and will be 'ultimate game changer',* CNBC, April 1, 2020, available at https://www.cnbc.com/2020/04/01/white-house-advisor-fauci-says-coronavirus-vaccine-trial-is-on-target-and-will-be-ultimate-game-changer.html.

[41] Stephen M. Kissler et al., *Projecting the transmission dynamics of SARS-CoV-2 through the postpandemic period,* April 14, 2020, available at *https://www.hsph.harvard.edu/news/hsph-in-the-news/intermittent-social-distancing-may-be-needed-through-2022-to-manage-covid-19/.*  ©

## VI.   THE EIGHTH AMENDMENT ALSO REQUIRES A SENTENCE OF HOME CONFINEMENT

The Eighth Amendment bars "cruel and unusual punishments," which includes deliberate indifference to unsafe, life-threatening conditions and punishments that "involve the unnecessary and wanton infliction of pain" or "are grossly disproportionate to the severity of the crime." *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (citation omitted); *Hutto v. Finney,* 437 U.S. 678, 682-83 (1978) (punitive confinement with prisoners who suffered from infectious diseases, in which mattresses were "removed and jumbled together each morning, then returned to the cells at random in the evening" violated Eighth Amendment).   Under ordinary circumstances, a five-month prison term would raise no Eighth Amendment concerns.   But given the rampant, uncontrolled spread of COVID-19 in the BOP, and the acute risks that infection poses to Ms. Janavs, incarceration would be grossly disproportionate to the severity of her crime.

## VII.   CONCLUSION

For the reasons stated above, Michelle Janavs moves to modify her sentence of imprisonment from a term of five months incarceration in the custody of the Bureau of Prisons ("BOP") to a term of supervised release with a condition of five months' home incarceration.

Respectfully Submitted,

MICHELLE JANAVS

By her attorneys,

Dated:  April 22, 2020

*/s/ John L. Littrell*

Thomas H. Bienert, Jr. *(pro hac vice)*
John Littrell *(pro hac vice)*
Bienert | Katzman PC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Tel: (949) 369-3700
tbienert@bienertkatzman.com
jlittrell@bienertkatzman.com

---

William Weinreb (BBO #557826)
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (617) 712-7114
billweinreb@quinnemanuel.com

Jonathan L. Kotlier (BBO #545491)
Nutter, McClennen & Fish, LLP
155 Seaport Boulevard
Boston, MA 02210-2604
Tel: 617-439-2000
jkotlier@nutter.com

**CERTIFICATE OF SERVICE**

I, John Littrell, hereby certify that on April 22, 2020, this document, filed through the CM/ECF system, will be sent electronically to all registered participants in this matter as identified on the Notice of Electronic Filing (NEF).

*/s/ John L. Littrell*
John L. Littrell
