# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:19-CR-10080-NMG |
| | ) | |
| | ) | |
| DAVID SIDOO, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MICHELLE JANAVS' SECOND MOTION TO MODIFY SENTENCE**

## I.     INTRODUCTION

Michelle Janavs pleaded guilty "straight up" to the indictment because she wanted to take responsibility for what she did.  She has never contested her guilt.  She filed no pretrial motions. Ms. Janavs paid her fine and forfeited her appeal.  She asked for only one thing:  that she be designated as quickly as possible so that she could immediately begin serving her time.

After her sentencing, but prior to her surrender date, the COVID-19 pandemic ripped through the United States.  The virus hit the federal prison system hard, causing an explosion of infections and deaths.  *See* Dkt. No. 1098 at 5-6.  On April 22, 2020, based on those extraordinary circumstances, Ms. Janavs respectfully requested that this Court convert her sentence to home confinement.  The government did not deny or minimize the risks that COVID-19 presents to Ms. Janavs or other prisoners.  Dkt. No. 1114 at 4.  Nor did the government deny the fact that Ms. Janavs has an underlying health condition that puts her at serious risk of illness and death if she becomes infected with COVID-19.  *Id*. at 16.  But rather than assent to a sentence modification to home confinement, the government urged this Court to continue her surrender date.

The Court likewise acknowledged that the COVID-19 pandemic was an "unprecedented and continually evolving cause of concern," and recognized the "particular transmission risk in penitentiary facilities."  Dkt. No. 1128 at 2.   The Court denied the motion, but extended Ms. Janavs' surrender date to June 30, 2020, to be consistent with the self-surrender date of Elizabeth Henriquez, Ms. Janavs' co-defendant.  *Id*.  "If the public health crisis has not abated by the time of the extended report date," the Court wrote, "the Court will entertain further motions."  *Id*. at 3.

The public health crisis has not abated.  When Ms. Janavs first requested a sentencing modification on April 22, 2020 the United States already had more confirmed cases (826,184) and more deaths (45,150) from the virus than any country in the world. Dkt. No. 1098 at 5.  In just the last month, both of those figures have doubled.  The conditions in the Bureau of Prisons ("BOP")

have deteriorated even more.  When Ms. Janavs first requested relief there were more than 1,000 reported COVID-19 cases among inmates in the BOP and 23 prisoners had died.  Dkt. No. 1098 at 10.  At the time of this filing there were more than 5,500 cases and 71 inmate deaths.[1]

Just as this Court had an obligation to impose a sentence that was warranted by Ms. Janavs' criminal conduct, the BOP has an obligation to execute that sentence.  But due to circumstances outside of Ms. Janavs' control, or this Court's, or even the BOP's, it is impossible to confine Ms. Janavs in BOP in a way that does not expose her to a serious risk of illness or death.  As a result, she has been living in a state of quasi-custody.  Unable to move on with her life, she is experiencing the anxiety and dread of a prospective prison sentence, but with no start date (or end date) in sight. The government may suggest that the Court continue the surrender date again.  But continuing the surrender date again serves no purpose other than to kick the can down the road, prolong Ms. Janavs' punishment, and frustrate the interests of the Court and the public in finality.

Ms. Janavs respectfully requests that the Court bring closure to her case by modifying her sentence to a term of time served and supervised release[2] with a condition of five months' home confinement so that she can serve her sentence under circumstances that do not expose her to an unreasonable risk of illness or death.  She is eligible for a sentencing modification under 18 U.S.C. § 3582(c) because of the unprecedented danger that COVID-19 presents to prisoners, like her, with an underlying health condition that makes them particularly vulnerable to serious illness or death from the disease.  She has exhausted her administrative remedies by making a formal written request of the warden of her facility, which was denied by BOP's Regional Counsel more than a month ago.  If this Court finds that more restrictive conditions of home confinement are necessary

---

[1] Federal Bureau of Prisons, COVID-19 Cases, available at
https://www.bop.gov/coronavirus/index.jsp (updated daily) (hereafter, "BOP COVID-19 Cases") (reporting 11,904 federal inmates who are currently infected, and 3,631 who have recovered).
[2] Ms. Janavs was arrested and booked into custody on March 12, 2019, so she has served one day of imprisonment and is eligible for supervised release.  *See* Presentence Report at ¶ 1.

to approximate the punishment it intended, it has a panoply of options available to it.  All Ms. Janavs asks is that whatever sentence the Court imposes, she be permitted to start serving it now.

## II.    BACKGROUND[3]

On October 21, 2019, Michelle Janavs pleaded guilty "straight up" to the indictment.  There was no agreement from the government to dismiss any of the charges or recommend a favorable sentence.  Ms. Janavs accepted responsibility for her crimes, stating (among other things):  "There are truly no words to express my heartache and shame caused by my actions."  Dkt. No. 872 (February 25, 2020 Transcript) at 53.  At sentencing, the government argued that a prison term was necessary for general deterrence.  *Id*. at 17.  When this Court sentenced Ms. Janavs to five months' imprisonment, near the high end of the guideline range, it also emphasized the need for general deterrence, stating "[y]our sentence needs not only to deter you from ever doing anything like this again but also to deter anyone else who has the gall to use his or her wealth to disparage our expectation for honest services from our public and private officials."  *Id*. at 54.  The Court's words and the sentence itself were widely publicized across the country.  *See* Dkt. No. 1098 at 4.

On March 2, 2020, counsel contacted the Court's deputy clerk to request that the Court expedite the Judgment and Commitment ("J&C") order, because Ms. Janavs wanted to surrender as quickly as possible.  *Id*.  Ms. Janavs was designated by the BOP to serve her sentence at the federal prison camp in Bryan, Texas ("FPC Bryan").  *Id*.  She was prepared to surrender and planned to do so right away.  At that point, there were only a handful of COVID-19 cases in the United States.[4]  The United States had reported its first death from COVID-19 only days earlier.

---

[3] If the government contests any of these facts, Ms. Janavs requests an evidentiary hearing.

[4] Johns Hopkins University of Medicine, Cumulative Cases, last visited May 31, 2020, available at https://coronavirus.jhu.edu/data/cumulative-cases.

But the situation deteriorated rapidly.  On March 13, 2020, President Trump declared a national emergency.[5]  By the third week of March there were 57,597 confirmed cases and 521 deaths.[6]

On March 23, 2020, counsel for Ms. Janavs sent a letter to Warden Steve Mora of FPC Bryan asking the BOP to move to convert her five-month prison sentence to home confinement because of the COVID-19 pandemic.  Dkt. No. 1098 at 13.  On April 1, 2020, undersigned counsel spoke with Jason Sickler, Regional Counsel for the Bureau of Prisons, to follow up on the request.  *Id*.  Mr. Sickler stated that the BOP had received the request, but because Ms. Janavs is not yet in custody, the BOP would not move for a sentencing modification on her behalf.  *Id*.

By April 2020, the number of infections and deaths in the United States had increased dramatically.  As of April 21, 2020, the United States reported 826,184 confirmed cases and 45,150 deaths.[7]  Because there is no cure for COVID-19 and no vaccination, the only way to prevent the spread of the disease is extreme "social distancing" and strict personal hygiene protocols.  As a result, there were major COVID-19 outbreaks in areas where people were living in close quarters, such as nursing homes, cruise ships, and prisons.  Prisons were hit particularly hard because of the unique challenges of attempting to "social distance" and maintain strict hygiene while in custody.

Having exhausted her administrative remedies, on April 22, 2020, Ms. Janavs respectfully requested that this Court modify her sentence from five months' imprisonment to five months of home confinement.  Dkt. No. 1098.  She presented to the government and to the Court a letter from her physician describing an underlying health condition that places her at a much higher risk of

---

[5] Donald Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* Mar. 13, 2020, available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

[6] The Atlantic, The COVID Tracking Project, available at https://covidtracking.com/data/us-daily

[7] Johns Hopkins University of Medicine, Coronavirus COVID-19 Global Cases, Center for Systems Science and Engineering, available at https://coronavirus.jhu.edu/map.html (updated daily).

serious illness or death than other prisoners if she were to contract COVID-19.  *Id*. at Ex. 2 (under seal).  As her doctor explained, Ms. Janavs' condition is hereditary, and lessens her ability to fight respiratory viral infections like COVID-19, particularly during the early stages of infection.  *Id*. Ms. Janavs' underlying health condition is one of the greatest risk factors for serious disease and death from a COVID-19 infection, according to the Centers for Disease Control ("CDC").[8]

The government did not dispute the fact that Ms. Janavs suffered from a serious underlying health condition that puts her at risk.  Nor did the government deny or minimize the risks that the COVID-19 pandemic posed for her in custody.  Dkt. No. 1114.  But rather than assent to her request to convert her sentence to home confinement, the government suggested that she "continue to seek to delay [her] self-surrender date[]" until a COVID-19 vaccine is developed.  *Id*. at 18.

The Court denied Ms. Janavs' motion on April 30, 2020.  Dkt. No. 1128.  But the Court acknowledged that COVID-19 was an "unprecedented and continually evolving cause of concern." *Id*. at 2.  The Court also acknowledged the "particular transmission risk in penitentiary facilities." *Id*. The Court followed the government's recommendation and postponed Ms. Janavs' surrender date to June 30, 2020, to be consistent with the delayed surrender date for Elizabeth Henriquez, who had also requested a sentence of home confinement as an alternative to incarceration due to the COVID-19 pandemic.  "If the public health crisis has not abated by the time of the extended report date," the Court stated, "the Court will entertain further motions."  *Id*. at 3.

The public health crisis has not abated.  At the time Ms. Janavs first requested a sentencing modification the United States already had more confirmed cases (826,184) and more deaths (45,150) from the virus than any country in the world.  Dkt. No. 1098 at 5.  In the last month, both of those figures have doubled.  The United States now has more than 1.8 million confirmed cases

---

[8] CDC, *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, March 31, 2020, available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.

and more than 100,000 deaths.[9]  Moreover, as most states relax their "social distancing" guidelines, and as protests erupt nationwide in response to the killing of George Floyd, experts predict that there will be a spike of new COVID-19 infections in the coming weeks.[10]

The conditions in the BOP have deteriorated even more dramatically.  When Ms. Janavs requested relief five weeks ago there were more than 1,000 reported COVID-19 cases among inmates in the BOP and 23 prisoners had died.  Dkt. No.1098 at 10.  According to the BOP, as of today there have been more than 5,500 confirmed cases of COVID-19 among inmates.[11]  But even these figures underestimate the number of infections.  As the BOP acknowledges, "[t]he positive test numbers are based on the most recently available **confirmed lab results** involving **open cases** from across the agency . . . ."[12]  The BOP is still not testing the vast majority of its inmates, *including many who are symptomatic*.  *See* Dkt. No. 1098 at 9; *see United States v. Esparza*, No. 07-CR-00294, 2020 WL 1696084, at *2 (D. Idaho April 7, 2020) (noting that testing inside prisons has been "scant except for people who self-report symptoms" and therefore "statistics about the number of infections already in BOP facilities are largely meaningless.").  As the BOP has acknowledged, it gave up on testing in facilities that are already experiencing "sustained transmission," choosing instead to simply assume that everyone is infected.[13]  That assumption

---

[9] Johns Hopkins University of Medicine, Coronavirus COVID-19 Global Cases, Center for Systems Engineering and Engineering, available at https://coronavirus.jhu.edu/map.html (updated daily).

[10] Daniela Hernandez and Brianna Abbott, *Protests Over Death of George Floyd Threaten a Jump in Coronavirus Cases,* The Wall Street Journal, May 31, 2020, available at https://www.wsj.com/articles/protests-over-death-of-george-floyd-threaten-a-jump-in-coronavirus-cases-11590967384

[11] BOP COVID-19 Cases.

[12] *Id.* (emphasis by BOP).

[13] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens, Mar. 31, 2020, available at https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/

appears to be correct.  The BOP recently conducted mass testing of inmates at FCI Lompoc, a low security facility in California, and nearly 70% of them tested positive for COVID-19.[14]

Thus, it does not matter that the BOP has reported no "confirmed cases" at FPC Bryan. That is not an indication of whether there are infected inmates there.  *See United States v. Feucht*, Case No. 11-cr-60025, Dkt. No. 53 (S.D. Fla. May 28, 2020) (granting compassionate release despite no confirmed cases at FCI Jessup because "[z]ero confirmed cases is not the same thing as zero COVID-19 cases" (citation omitted)); *United States v. Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, **2-4 (D. Nev. Apr. 17, 2020) (granting compassionate release to defendant at FPC Atwater, notwithstanding absence of confirmed COVID-19 cases, because it was impossible for medically vulnerable inmates to protect themselves from the virus there); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (releasing medically vulnerable inmate from FCI Loretto, despite no reported COVID-19 cases there, because he could not adequately protect himself in line with CDC guidelines); *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221, at *6 (E.D.N.Y. Apr. 17, 2020) ( "I cannot conclude that no cases are, in fact, present, without assurances that the BOP is routinely testing everyone within the facility.").

To illustrate the point, on April 28, 2020, a female prisoner died of COVID-19 after giving birth at FMC Carswell, a women's medical facility in Fort Worth, TX, about 170 miles away from FPC Bryan.[15]  BOP reports that the facility has zero confirmed cases, one inmate recovered, and

---

[14] Richard Winton, *70% of Inamtes Test Positive for Coronavirus at Lompoc Federal Prison,* Los Angeles Times, May 9, 2020, available at https://www.latimes.com/california/story/2020-05-09/coronavirus-cases-lompoc-federal-prison-inmates

[15]  Jozelyn Escobedo, *Fort Worth Inmate Who Had COVID-19 Dies Weeks After Giving Birth While on Ventilator,* April 29, 2020, available at https://www.wfaa.com/article/news/health/coronavirus/fort-worth-inmate-who-had-covid-19-dies-weeks-after-giving-birth-while-on-ventilator/287-a2c0f7b0-8897-4d27-b5e3-0c2aaa7e14ca.

one dead.[16]  By contrast, FMC Fort Worth, a men's medical facility in the same town, where widespread testing was conducted, reports more than 600 confirmed cases and 10 deaths. [17][18]

Perhaps the only reliable indicator of how safe the BOP is for people with underlying health conditions is the number of inmate deaths.  That figure has more than *tripled* in the past month from 23 to 71.[19]  The government does not contend that the BOP is currently safe for a person, like Ms. Janavs, with a documented health condition.  Ms. Janavs should not be forced to choose between risking her life by surrendering to BOP custody or waiting indefinitely to serve her time.

## III.    ARGUMENT

A court may grant a sentence reduction either upon motion of the Director of the BOP, or upon motion of the defendant after "the lapse of 30 days from receipt of such a request [from the defendant] by the warden of the defendant's facility, whichever is earlier. . . ." 18 U.S.C. § 3582(c)(1)(A).  In order to modify a sentence, a district court must engage in a three-step process.

First, the court must reevaluate the 18 U.S.C. § 3553(a) factors.  18 U.S.C. § 3582(c)(1)(A).

Second, the court must find that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"  18  U.S.C.  §  3582(c)(1)(A)(i).  The Sentencing Commission has determined that "extraordinary and compelling reasons" include (1) medical conditions which diminish the ability of the defendant to provide self-care in prison, (2) age-related deterioration,

---

[16] BOP COVID-19 Cases
[17]  William Joy, *Family Members Concerned as Coronavirus Cases Skyrocket in Fort Worth Federal Prison,* April 28, 2020, available at
https://www.wfaa.com/article/news/health/coronavirus/family-members-concerned-as-coronavirus-cases-skyrocket-in-fort-worth-federal-prison/287-5a79594d-b12a-41b1-9eaa-2d6b168766db
[18] BOP COVID-19 Cases.
[19] BOP COVID-19 Cases.

(3) family circumstances, and (4) other extraordinary and compelling reasons that exist either separately or in combination with the previously described categories.  USSG § 1B1.13.

Third, the Court must find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  18 U.S.C. § 3582(c)(1)(A).

### A.  Ms. Janavs has Fulfilled § 3582(c)'s Exhaustion Requirement

First, Ms. Janavs made a formal written request to the warden of her facility, and that request was denied by BOP's Regional Counsel.  Dkt. No. 1098 at 13**.**  When an inmate's request for an agency-sponsored motion for compassionate release is denied by the BOP's General Counsel, that denial is a "final administrative decision" by the BOP that cannot be appealed.  28 C.F.R. § 571.63.  Every court to have considered the issue has agreed that a defendant whose request for compassionate release is denied by BOP's General Counsel has exhausted remedies.  *See United States v. Johnson*, No. 15-CR-125 (KBJ), 2020 WL 2515856 (D.D.C. May 16, 2020) (finding that "there can be no doubt that [defendant's] letter to the BOP seeking an agency-sponsored motion for compassionate release initiated the administrative process for the purpose of section 3582(c)(1)(A)," and that when "BOP's general counsel responded that BOP 'will not be able to consider [the defendant] . . . for compassionate release' because he is 'not currently in BOP custody,' [the defendant] unquestionably exhausted all of the administrative remedies that were available to him, as set forth in the BOP's own regulations.");  *United States v. Gonzalez*, No. 18-CR-232, 2020 U.S. Dist. LEXIS 56422 at *4-5 (E.D. Wash. March 31, 2020) (same);  *United States v. Hernandez*, No. 18-cr-834, 2020 U.S. Dist. LEXIS 58739 (S.D.N.Y. April 2, 2020) (same); s*ee also United States v. Macfarlane,* No. CR 19-10131-NMG, 2020 WL 1866311, at *1 (D. Mass. Apr. 14, 2020) ("Defendant Macfarlane has requested that the BOP file a motion to

reduce his sentence and the BOP has denied that request.  The Court finds that defendant has therefore fully exhausted his administrative rights and his motion is properly before this Court.").

Second, even if the representation of BOP Regional Counsel that Ms. Janavs' request was denied did not settle the matter, the BOP has not otherwise responded to Ms. Janavs' request. More than thirty days have lapsed since Ms. Janavs made her request on March 23, 2020. *See* 18 U.S.C. § 3582(c)(1)(A).  Therefore, Ms. Janavs has exhausted her remedies that way too.

Third, it has become clear that BOP has a policy of refusing to consider motions for compassionate release by prisoners who are not in BOP custody.  The government has taken the position that that policy is supported by law. *See* Dkt. No. 1114 at 9 ("[B]ecause Janavs is not yet in custody, BOP could not act on her request."); *id*. ("[T]he plain language of the statute . . . does not contemplate a motion by an individual who is not yet in BOP custody.").  According to the government, it would be *impossible* for Ms. Janavs to exhaust her remedies unless she were to surrender to BOP, which would expose her to precisely the type of risk her motion is meant to prevent. *Id*.  The government is wrong, as we have previously pointed out. *See* Dkt. No. 1124. But the BOP has adopted that view.  As a result of this policy, any further attempt by Ms. Janavs to exhaust administrative remedies with the BOP would be futile. *See United States v. Van Dyke*, No. 2:15-CR-0025-JLQ-1, 2020 WL 1811346, at *2 (E.D. Wash. Apr. 8, 2020), *adhered to on reconsideration*, No. 2:15-CR-0025-JLQ-1, 2020 WL 1845553 (E.D. Wash. Apr. 10, 2020) (holding that a defendant awaiting transfer to BOP was excused from the exhaustion requirement because "[d]efendant is not in the custody of the BOP," and "[t]herefore, there is no warden to petition."  "Any attempts to exhaust administrative remedies would be futile").[20]

---

[20] Even if Ms. Janavs had not both exhausted her administrative remedies *and* waited 30 days before filing, this Court could excuse both requirements. The First Circuit has never held that section 3582(c)(1)(A)'s exhaustion requirement is jurisdictional, and this Court should join the many others in this district that have held it is not. *See United States v. Guzman Soto*, No. 18-cr-10086, —— F.Supp.3d ——,2020 WL 1905323, at *3-4 (D. Mass. Apr. 17, 2020); *United States*

**B.      The 3553(a) Factors Favor Reducing the Sentence to Home Confinement**

Ms. Janavs is a mother of three and a philanthropist who has dedicated decades of her life to helping others, particularly vulnerable children.  The Court recognized Ms. Janavs' heart-felt remorse and her many deeds of charity and kindness and found that her unique circumstances warranted a reduction in what otherwise would be a warranted sentence.  Dkt. No. 872 at 55.  The Court's decision to sentence her to prison was driven by the need to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and the need to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A), (B).  There was no discussion at the original sentencing of the need to "provide the defendant with needed . . . medical care . . . ," 18 U.S.C. § 3553(a)(2)(D), or to protect BOP staff and inmates from additional risk of infection, because the COVID-19 pandemic had not yet begun in the United States.

If Ms. Janavs were sentenced today, the Court would be required to balance the need to punish her and deter others with a short prison term against the risk that that term posed to her health, and possibly her life.  In *United States v. Pena*, No. 16-cr-10236-MLW, ECF No. 221 (D. Mass., May 29, 2020), Judge Wolf had sentenced a white-collar offender to 32 months' imprisonment for defrauding the United States government of $2.5 million.  After serving seven months of his term, Pena moved the Court to convert the remainder of his term to home confinement.  Although there were no confirmed COVID-19 cases at FMC Devens, the prison camp where Pena was housed, the Court granted the motion, finding that the risks posed to Pena outweighed the need to incarcerate him.  *Id*. at 10.  Like this Court, Judge Wolf held that the COVID-19 pandemic was "extraordinary" and that it had "created unforeseen and extreme risk" to inmates in BOP's custody.  *Id*. at 18.  Although there were no infections at FMC Devens, the

---

*v. Ilarraza*, No. 18-CR-10041-RWZ, 2020 WL 2475647, at *1 (D. Mass. May 13, 2020) *United States v. Ramirez*, No. CR 17-10328-WGY, 2020 WL 2404858 (D. Mass. May 12, 2020).

Court noted that there were several infections at a nearby medical center, and that it was only a matter of time before infections appeared at the camp, despite the restrictive conditions imposed by the BOP, and despite the Warden's best efforts. *Id.* at 9-10. The Court emphasized that "[i]n all white-collar cases, the interest of general deterrence is important." *Id.* at 20. But "in view of the danger of being in prison created by the COVID-19 virus, the seven months Pena has served should be sufficient to send the message that it would be a miscalculation, potentially a fatal miscalculation, for anyone to defraud the United States now." *Id.*; s*ee also United States v. Young*, No. CR19-5055 BHS, 2020 WL 2614745, at *4 (W.D. Wash. May 22, 2020) (granting home confinement to defendant even though doing so would "clearly frustrate the purpose of deterrence, both general and specific" because the defendant's underlying health condition and the spread of COVID-19 dramatically shifted the weight the Court gave to the factor requiring that it provide the defendant with "needed ... medical care in the most effective manner.").

The same rationale applies here. Although a sentence of five months of imprisonment may have been appropriate to punish Ms. Janavs at the time it was imposed, the punitive value of that sentence is far outweighed by the grave danger it would pose for Ms. Janavs now. And converting her sentence to home confinement in response to an unprecedented health pandemic would not dilute the deterrent value of the sentence this Court imposed. No one will interpret an order modifying Ms. Janavs sentence as anything other than a necessary response to a public health crisis. Indeed, even the government appears to recognize that things have changed since February. In a recent plea agreement, the government agreed to recommend a sentence of home confinement for a parent whose conduct is comparable to Ms. Janavs' conduct, and whose sentencing guideline range is 21-24 months. *See United States v. Peter Demaris*, No. 1:20-cr-10099-RGS, Dkt. No. 2.

Finally, when evaluating whether a term of home confinement can constitute "just punishment" for Ms. Janavs' offense, this Court should consider the heavy burden that Ms. Janavs

has endured since this Court imposed sentence on her three months ago. Although she has not been in physical custody, she has endured near-constant anxiety. *See* **Ex. 1** (June 3, 2020 Letter from Michelle Janavs). Ms. Janavs was prepared to serve her sentence shortly after it was imposed. Had she surrendered then she would have served approximately three months by now. She would have a release date. Instead, she has made no progress. She wakes up every day fearful of contracting COVID-19 and becoming seriously ill or dying. And "the uncertainty of when and if it will be safe" for her to go to prison also hangs over her "like a dark cloud." *Id*.

If this Court finds that a sentence of home confinement is not sufficiently punitive it has the authority to impose strict conditions, including electronic monitoring and strict limits on approved absences from the home. U.S.S.G. § 5F1.2, cmt. n. 1. If it concludes that the amenities in Ms. Janavs' home would cause detention there to be insufficiently punitive, it can limit those amenities, or even order that she be confined in a residence with fewer amenities. *Id*. at cmt. n. 2. The Court also has the authority to increase Ms. Janavs' community service commitment.

### C.    Ms. Janavs Poses No Danger to Anyone

It is undisputed that Ms. Janavs poses no danger to any other person or the community.

### D.    Extraordinary Circumstances Warrant Home Confinement

This Court has already held that the COVID-19 pandemic is an extraordinary and compelling circumstance warranting release to home confinement. *See Macfarlane*, 2020 WL 1866311, at *1. It did so in a case where the defendant was not even health compromised. The Court reasoned that release was warranted in light of the COVID-19 pandemic and national emergency, the particular risk of infection and transmission risk in penitentiary facilities, the fact that the defendant was a non-violent first offender who posed no danger to the community, and the fact that he was subject to quarantine in solitary confinement in a higher-security facility.

That logic applies with even greater force here because Ms. Janavs has a health condition rendering her particularly vulnerable.  *See United States v. Huneeus*, No. CR 19-10117, Dkt. No. 642 (D. Mass. Mar. 17, 2020) (finding that extraordinary and compelling circumstances warranted sentence modification and ordering defendant released to home confinement "in light of the national state of emergency due to the global COVID-19 pandemic and Huneeus' unique health circumstances . . . ."); *see also United States v. Sloane*, No. CR 19-10117-IT, Dkt. No. 647 (finding that release "may well be warranted in light of the pandemic due to COVID-19, the national emergency as declared by the President of the United States, the risk of infection and transmission for inmates and staff posed by the population density of prisons, and the fact that Defendant is a first time offender who does not pose a danger to the safety of another person or the community," but denying motion because of unexplained failure to exhaust administrative remedies); *United States v. Juan Ramos*, No. 18-CR-30009-FDS, 2020 WL 1478307, at *1 (D. Mass. Mar. 26, 2020) (ordering pre-trial release for a defendant who had previously been found to be a risk of flight and danger to the community because defendant was diabetic and asthmatic and therefore at high risk for contracting COVID-19); *Maria Savino v. Steven J. Souza,* --- F. Supp. 3d ---, No. CV 20-10617-WGY, 2020 WL 1703844, at *8 (D. Mass. Apr. 8, 2020) (granting bail for habeas petitioners in ICE custody to prevent risk of COVID-19 infection after finding that "[e]ven the young and otherwise healthy detainees face a 'substantial risk'" of serious harm from COVID-19).

Indeed, if Ms. Janavs were in custody now, it is likely that she would be processed for release to home confinement.  On March 26, 2020, the Attorney General directed the BOP to use its authority to "prioritize" the transfer of eligible prisoners to home confinement in order to prevent the spread of COVID-19.[21]  He instructed that "in assessing which inmates should be

---

[21] Office of the Attorney General, Memorandum for Director of Bureau of Prisons, March 26, 2020, available at  https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf

granted home confinement" the BOP should consider a number of factors, including (1) the age and vulnerability of the inmate to COVID-19, in accordance with the [CDC] guidelines, (2) the security level of the facility currently holding the inmate, (3) the inmate's PATTERN score, (4) the existence of a verifiable reentry plan, and (5) the inmate's crime of conviction and assessment of the danger posed by the inmate to the community. All the criteria set forth in that memo would favor Ms. Janavs' release. Eight days later, the Attorney General expanded that directive in response to "significant levels of infection at several [BOP] facilities."[22] He conceded that the BOP's precautions "have not been perfectly successful" at all BOP institutions and directed BOP staff to "move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions." *Id*. The Attorney General directed that "all at-risk inmates – not only those who were previously eligible for transfer" should be processed for release. *Id*.

But the process of onboarding prisoners and then releasing them to home confinement has proved to be a logistical nightmare for the BOP and a harrowing ordeal for prisoners. As this Court saw in the case of Mr. Macfarlane, the BOP required him to undergo a 14-day locked-down quarantine prior to being released. *Macfarlane*, 2020 WL 1866311, at *1. Because the camp where he was housed had no quarantine facility, he was transferred to a higher-security facility where he was confined to a cell for 23 hours a day and was not able to contact his family. *Id*. This Court found that Macfarlane's two-week confinement in solitary quarantine was the "equivalent of two months in the Camp to which he was originally assigned." *Id*. It would serve no purpose to require Ms. Janavs to surrender to the custody of the BOP when the BOP is scrambling to process defendants like her for transfer into home confinement. The process of surrendering to a remote BOP facility, seeking early release, and then being transferred to another facility where she might

---

[22] Office of the Attorney General, Memorandum for Director of Bureau of Prisons, April 3, 2020, available at https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf

have to spend another 14-days in solitary confinement would create unnecessary risk and hardship for Ms. Janavs, other inmates, and BOP staff, their families, and communities.

## IV.    CONCLUSION

For the reasons stated above, Ms. Janavs respectfully requests that the Court modify her sentence from a term of five months; incarceration in the custody of the BOP to a term of supervised release with a condition of five months' home confinement.

Respectfully Submitted,

MICHELLE JANAVS

By her attorneys,

Dated:  June 3, 2020

*/s/ John L. Littrell*
Thomas H. Bienert, Jr. *(pro hac vice)*
John Littrell *(pro hac vice)*
Bienert | Katzman PC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Tel: (949) 369-3700
tbienert@bienertkatzman.com
jlittrell@bienertkatzman.com

William Weinreb (BBO #557826)
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
Tel: (617) 712-7114
billweinreb@quinnemanuel.com

Jonathan L. Kotlier (BBO #545491)
Nutter, McClennen & Fish, LLP
155 Seaport Boulevard
Boston, MA 02210-2604
Tel: 617-439-2000
jkotlier@nutter.com

**CERTIFICATE OF SERVICE**

I, John Littrell, hereby certify that on June 3, 2020, this document, filed through the CM/ECF system, will be sent electronically to all registered participants in this matter as identified on the Notice of Electronic Filing (NEF).

*/s/ John L. Littrell*
John L. Littrell